**Jonathan Brock STANSBURY,
Appellant**

v.

**COMMONWEALTH of Kentucky,
Appellee**

**2013–SC–000592–MR**

Supreme Court of Kentucky.

RENDERED: February 19, 2015

295

COUNSEL FOR APPELLANT: Robert Chung–Hua Yang, Assistant Public Advocate

COUNSEL FOR APPELLEE: Jack Conway, Attorney General, Todd Dryden Ferguson, Assistant Attorney General

OPINION OF THE COURT BY JUSTICE KELLER

A Bell County Circuit Court jury convicted Jonathan Brock Stansbury (Stansbury) of the attempted murder of his fiancee, Clorah Falconer; of first-degree arson; and of being a second-degree persistent felony offender (PFO), enhancing his twenty-year sentence to life in prison. Stansbury appeals his conviction as a matter of right under Ky. Const. § 110(2)(b). Before this Court, Stansbury argues the trial court committed reversible error: (1) by denying him the right to present a defense when it limited defense counsel's questioning of the arson investigator; (2) by allowing detailed evidence that he abused Falconer's pets; (3) by allowing the prosecutor to appeal to general and local prejudice regarding his bipolar schizophrenia, and anger problems, and status as a non-native eastern Kentuckian; and (4) by admitting improper sentencing-phase evidence. Having reviewed the record and the parties' arguments, we affirm in part, reverse in part, and remand.

## I. BACKGROUND.

Stansbury began living with Falconer in July 2010. Falconer's three parakeets, four cats, two puppies, a turtle, and a goldfish lived with the couple inside the house and Falconer's two dogs and a duck lived outside. On February 3, 2012, sometime between 10 and 11 p.m., Stansbury arrived home, and he and Falconer ate a a late meal. At approximately 3:00 a.m., Falconer went to bed, but Stansbury stayed up watching television on the couch.

Later that morning, Falconer awoke and noticed smoke throughout the house. She tried to get out the back door, but it was locked. She then tried to find Stansbury in the living room, but he was gone. Falconer then opened the windows, got as many of her pets out of the house as she could, and went to a neighbor's to call the fire department.

Nicholas Maricle (Maricle) of the Middlesboro Fire Department and Justin Barton (Barton) and Brad Cawood (Cawood) of the Middlesboro Police Department arrived at Falconer's home at or near the same time. At trial, all three testified that they noticed a large burn mark on the carpet near the front door; a burn mark on the adjacent wall; a burn mark leading toward the back door; the odor of petroleum; the back door was locked so that it would not open from the inside; and the smoke detector was missing.

Because he noticed the smoke detector was missing, Barton requested assistance from an arson investigator. Kentucky State Police arson investigator Josh Bunch (Detective Bunch) conducted a preliminary investigation and concluded that the fire had not been caused by an electrical malfunction.

When Barton interviewed Falconer, she stated that her cell phone, house keys, as well as Stansbury's Xbox, video games, BB gun, cane, clothes, and weed eater were missing. She also told Barton that the missing smoke detector had been there when she went to bed, and that Stansbury might be at Eddie Reed's (Reed) house.

Barton went to Reed's house and found Stansbury hiding on the floor behind Reed's bed. Stansbury then told Barton that: he arrived home at approximately

11:00 p.m.; after Falconer went to bed, he went to Reed's house to do laundry; when he left, he locked the back door, as he always did, and took his house key; he took the smoke detector down because it was not working; he did not know how the fire started, but he had been cleaning two leg wounds and spilled some alcohol on the floor; and he took a gun, weed eater, and his and Falconer's cell phones when he left. Reed subsequently returned the Xbox and games, the BB gun, the weed eater, and some clothes to Falconer, and Falconer found the smoke detector in the yard several days after the fire.

A grand jury indicted Stansbury for attempted murder, arson in the first-degree, and for being a second-degree PFO. As noted above, a jury convicted Stansbury of those charges. We supplement additional facts as necessary below.

## II. ANALYSIS.

### A. The Trial Court Did Not Impede Stansbury's Right to Present a Defense by Limiting Stansbury's Questioning of Detective Bunch.

The standard of review on evidentiary issues is abuse of discretion. *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky.2007). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky.1999).

The Commonwealth questioned Detective Bunch regarding the origin of the fire, the electrical outlets in Falconer's home, and the tornado shaped burn mark near the door. Detective Bunch testified that he was confident the fire did not start at an electrical outlet, but began on the floor and proceeded up the wall where the electrical outlet was positioned.

Stansbury's counsel cross-examined Detective Bunch as follows:

*Defense Counsel:* Now, let me ask you about the shape. It appears that an arsonist would, if the front door was the only exit, the side door, as you've explained, the door was locked and unless you had a key, there's no exit that way. Would an arsonist put the bulk of the tornado before the exit, the only exit, then walk back to the house 'til it got smaller? Would an arsonist walk in the house and put the bulk back there by the living room/dining room and come out to the door and it would have a smaller area at the exit door?

*Commonwealth:* Your Honor, I'm going to object to the question. What an arsonist would do is not relevant to this case.

*Judge:* Rephrase.

*Defense Counsel:* Well, using your experience with arson fires.

*Commonwealth:* I'm objecting to the relevance of the generic arsonist. What an arsonist would do. It is not relevant.

*Judge:* Rephrase it.

*Defense Counsel:* How many arson fires have you worked?

*Detective Bunch:* Over the course of five years, I don't have a specific count of arson fires. I mean, it would be in terms of, you know, there's a suspected arson, there's conviction of arson, there are some fires that you don't have a suspect for. So I couldn't put a number on that to answer your question.

*Defense Counsel:* Alright, but you've done several?

*Detective Bunch:* I would be comfortable saying that there have been several.

*Defense Counsel:* Okay, in the arson fires that you have had experience with, how is the accelerant poured?

*Commonwealth:* Your Honor, I object to the relevance. That has nothing to do with this set of facts. There is no relevance in asking someone testifying about a specific set of facts how someone else might have done it. It's irrelevant.

*Defense Counsel:* It's not irrelevant, because the question here today is did the person, we don't know who the person was that set the house on fire. And where did the person go? Did they go towards the back of the house where the door was locked and the exit door, or did they come towards the front of the house where they could have gotten out?

*Judge:* So the question for the officer is?

*Defense Counsel:* Do you think the person that started the fire went out the front door or went inside to go back in the house towards the back door?

*Commonwealth:* I raise the same objection. This officer, respectfully, is not in a position to guess, and that's all that is, how he got out, or how the generic arsonist would do it. That's ...

*Defense Counsel:* He's an expert. He should be able to tell about the accelerant and how it was distributed.

*Commonwealth:* That question is not relevant and it's not probative to have him speculate, and that's all that would be, as to how another arsonist might have done it, is not relevant and it's speculative, and it provides no information that would help this jury decide this case.

*Defense Counsel:* It provides a lot.

*Judge:* That objection will be sustained. If you would like, pose some sort of hypothetical question but otherwise let's move on.

Stansbury's defense counsel finished questioning Detective Bunch soon thereafter.

 Stansbury argues that the trial court's ruling impeded his ability to develop his defense. The Commonwealth argues this issue is unpreserved[1], and if preserved, the trial court's ruling was correct because the questions were irrelevant and speculative. We agree the questions were irrelevant, but Stansbury did preserve the issue for appeal when he told the trial court what questions he wanted to ask. KRE 103 states:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected; and ... If the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Furthermore,

> To preserve a trial court's ruling for appeal, a substantial right of the party must be affected and, relevant to the present case, the substance of the excluded testimony must be provided to the trial court. Notably, KRE 103(a)(2) now allows an *offer of proof* rather than requiring "the witness [ ] make a specific offer of his answer to the question." An offer of proof, generally described as a lawyer "adducing what that lawyer expects to be able to prove through a

---

**1.** The Commonwealth argued the issue was unpreserved because Stansbury did seek to make an avowal or proffer, citing *Partin v. Commonwealth*, 168 S.W.3d 23, 31–32 (Ky. 2005); *Caldwell v. Commonwealth*, 133 S.W.3d 445, 450 (Ky.2004); and *Varble v. Commonwealth*, 125 S.W.3d 246 (Ky.2004). In 2007, the legislature amended KRE 103 to allow a lawyer to preserve an error for review by merely making the substance of excluded testimony "known to the court by offer" as opposed to requiring an avowal to preserve the issue. Thus, to the extent the preceding opinions disagree with KRE 103, they are overruled.

witness's testimony[,]" serves dual purposes. First, the offer of proof provides the trial court with a foundation to evaluate properly the objection based upon the actual substance of the evidence. And, of equal importance, an offer of proof gives an appellate court a record from which it is possible to determine accurately the extent to which, if at all, a party's substantial rights were affected. *Henderson v. Commonwealth*, 438 S.W.3d 335, 339–40 (Ky.2014)(emphasis in original) (citing Bryan A. Garner, *Garner's Dictionary of Legal Usage*, p. 630 (3d ed. 2011)). Because Stansbury told the court what testimony he sought to elicit, the issue was preserved.

Having determined that Stansbury preserved the issue, we discern no error in the trial court's ruling. Stansbury's argument is twofold: that these questions were relevant; and that their exclusion was a violation of due process. We address each argument in turn.

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." KRE 401. Relevant evidence is "admissible, except as otherwise provided by the Constitutions of the United States and the Commonwealth of Kentucky, by Acts of the General Assembly of the Commonwealth of Kentucky, by these rules, or by other rules adopted by the Supreme Court of Kentucky. Evidence which is not relevant is not admissible." KRE 402. Furthermore, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." KRE 403.

■ Stansbury argued this line of questioning would have supported an alternative suspect theory. The trial court in its broad discretion correctly ruled otherwise. In addressing this argument, we first note that there was no credible evidence that another person started the fire. Furthermore, what a typical arsonist might do in no way would have supported Stansbury's theory that someone else started the fire. Therefore, evidence regarding what a typical arsonist would do had no tendency to make a fact of consequence—who started the fire—more or less probable, and it was irrelevant. Additionally, what the typical arsonist would do is irrelevant because the issue before the jury was what Stansbury did, and there was no evidence that Stansbury was a "typical arsonist."

■ As to his due process argument, Stansbury is correct that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Beaty v. Commonwealth*, 125 S.W.3d 196, 206 (Ky.2003) *citing Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). And that "the 'right to present a defense,' is firmly ingrained in Kentucky jurisprudence." *Id.* However, as the Commonwealth correctly notes, the exclusion of evidence must "significantly undermine fundamental elements of the defendant's defense" to be declared unconstitutional. *Id.* at 206–07 *quoting United States v. Scheffer*, 523 U.S. 303, 315, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

The trial court, in sustaining the Commonwealth's objection, correctly excluded irrelevant evidence, which did not deprive Stansbury of a fundamentally fair trial. Furthermore, after sustaining the Commonwealth's objection, the trial court advised Stansbury's counsel that he might be

able to elicit the desired testimony through use of a hypothetical question. Stansbury did not follow the court's advice and let the matter drop. Absent any other considerations, Stansbury's failure to follow the court's advice makes his argument that he was deprived of due process wholly unpersuasive.

Therefore, for the foregoing reasons, we hold the court did not exceed its discretion when it limited Stansbury's cross-examination of Detective Bunch.

### B. The Admission of Evidence of Stansbury's Abuse of Falconer's Pets Was Not Error.

■ Stansbury argues the trial court improperly admitted evidence that he abused Falconer's pets. The Commonwealth argues that, if the evidence was inadmissible, Stansbury opened the door by asking Falconer whether Stansbury had fed the pets.

■ Stansbury admits this issue is unpreserved and therefore is reviewed for palpable error under RCr 10.26. A palpable error "affects the substantial rights of a party ... and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr. 10.26. To ascertain the existence of manifest injustice, "a reviewing court must plumb the depths of the proceeding ... to determine whether the defect in the proceeding was shocking or jurisprudentially intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky.2006).

During its case in chief, the Commonwealth presented evidence that Falconer cared for her pets so much that she was unwilling to go to the hospital for fear that no one else would care for them. In an apparent attempt to show that Stansbury also cared for the pets, his counsel asked Falconer whether Stansbury had ever fed the pets. Falconer admitted that he had.

On re-direct examination, the Commonwealth asked Falconer how Stansbury had treated her pets. Falconer responded that, "He used to abuse them. Beat them ... They was on chains and stuff and he'd beat their heads down into the floor and bust their teeth out. He'd run outside and beat on the animals with their chains. He took and broke my duck's neck."

Stansbury now argues that this testimony by Falconer was irrelevant and improper "bad character" evidence.

■ Generally, "[C]haracter can be proven only by evidence of general reputation or by opinion, not by specific instances of conduct." *Tamme v. Commonwealth*, 973 S.W.2d 13, 29 (Ky.1998); KRE 405. Moreover, KRE 404(a) holds that "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." KRE 404.

■ However, "[W]hen one party introduces improper evidence, such 'opens the door' for the other party to introduce improper evidence in rebuttal whose only claim to admission is that it explains or rebuts the prior inadmissible evidence." *Metcalf v. Commonwealth*, 158 S.W.3d 740, 746 (Ky.2005) *citing Norris v. Commonwealth*, 89 S.W.3d 411, 414 (Ky.2002).

In *Commonwealth v. Higgs*, 59 S.W.3d 886, 894 (Ky.2001), we held testimony by Higgs's father that Higgs was not a thief "opened the door" to evidence that Higgs's father had accused Higgs of stealing property from him. In *Johnson v. Commonwealth*, 105 S.W.3d 430, 441–42 (Ky.2003) we held that Johnson's daughter's testimony that she never saw her father have any illegal drugs in their home was impermissible character evidence by the daughter. However, that testimony opened the door, "if only slightly," to cross-examination

about specific other related instances of Johnson's conduct, such as his prior drug trafficking convictions.

Stansbury is correct that he did not initiate testimony regarding the extent to which Falconer cared for her pets. However, it was Stansbury who elicited testimony from Falconer about the extent to which he cared for her pets, testimony that could have been excluded as inadmissible character evidence. However, as we held in *Metcalf,* once Stansbury opened the door to the introduction of "good" character evidence, he cannot complain if the Commonwealth walked through that door and introduced character evidence not to his liking. Therefore, we hold no error occurred.

### C. The Commonwealth's Questioning of Witnesses About Stansbury Being from Outside Bell County and About Stansbury's Mental Illness and Anger Management Issues Was Not Palpable Error.

Stansbury argues that the prosecutor, through his questioning of witnesses, "testified" that Stansbury was from out of town and suffered from mental illness and anger management issues, thus impermissibly appealing to the jurors' local and general prejudices. The Commonwealth argues that Stansbury opened the door to its questioning in these areas, that the issues were not preserved, and that any error was not palpable. Stansbury admits this issue is unpreserved and is therefore reviewed under the standard set forth in RCr 10.26 and the aforementioned case law.

Stansbury complains primarily about the Commonwealth's questioning of three witnesses: Falconer, "Granny" Selfridge (Selfridge), and Doug King (King). On direct-examination, Falconer testified that she and Stansbury lived together. On cross-examination, Stansbury asked Falconer about the couple's relationship and she replied that, although they sometimes fought, they were in love and she hoped they would get married. On redirect examination, the Commonwealth asked Falconer if she knew where Stansbury was from, how he came to be in Bell County, and how long he had been there. Falconer testified she did not know where Stansbury came from but she met him through her son right before Stansbury and her son both went to jail. The Commonwealth also asked Falconer if she knew if Stansbury had been diagnosed with any mental problems, and she replied that he suffers from bipolar schizophrenia for which he was prescribed medication, and that he has anger management issues.

Selfridge, who testified on behalf of Stansbury, stated on cross-examination that she did not know where Stansbury came from; that he did not have any family in the area; and that he had worked for the carnival. When asked if Stansbury had been "left" by the carnival, Selfridge said that she did not know if that was true.

King also testified on behalf of Stansbury and stated on direct-examination that Stansbury was good to Falconer and that he "babied" her. Furthermore, King stated that he was aware that Stansbury had received treatment and took medication for a bipolar disorder. On cross-examination, the Commonwealth asked King if he knew of any instances when Stansbury had not been good to Falconer or when Stansbury had abused her, specifically asking if King knew if Stansbury had ever choked or raised his fist to Falconer. King testified that he had no knowledge of any such abuse, but he admitted that Stansbury had described Falconer as "the devil."

Stansbury now argues that the Commonwealth's "testimony" about his status as a stranger to Bell County, his mental

illness, and his anger management issues amounted to reversible prosecutorial misconduct. We disagree.

 Prosecutorial misconduct can come in different forms, including improper questioning and improper closing argument. *Duncan v. Commonwealth*, 322 S.W.3d 81, 87 (Ky.2010) *citing Brown v. Commonwealth*, 313 S.W.3d 577 (Ky.2010). "Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the' trial fundamentally unfair." *Duncan*, 322 S.W.3d at 87. Furthermore:

> Counsel in argument to the jury should avoid saying anything designed as, or having the effect of, an appeal to the social, class, or sectional prejudices of the jury. Likewise, appeals to local or sectional prejudices, to the self-interest of jurors as taxpayers, are highly improper and are not to be condoned.

*Taulbee v. Commonwealth*, 438 S.W.2d 777, 779 (Ky.1969).

Stansbury's argument, although somewhat confusing, appears to be threefold: (1) the Commonwealth's questioning of the witnesses amounted to "testimony" by the Commonwealth; (2) the Commonwealth impermissibly introduced character evidence related to his mental illness and anger management issues; and (3) the Commonwealth impermissibly appealed to juror prejudice against strangers and the mentally ill. We address each issue separately below.

 Initially, after reviewing the complained of questioning by the Commonwealth, we fail to discern how it amounted to "testimony." The questions were short, had a basis in fact, and, as often as not, elicited testimony favorable to Stansbury. Furthermore, the case law cited by Stansbury is inapplicable because it deals with Commonwealth attorneys injecting their own credibility into the proceedings as a substitute for witness credibility. The Commonwealth's questions cited by Stansbury do not cross that line.

 As to character evidence, Stansbury is correct that, generally, evidence of his mental illness and anger management issues could have been excluded. However, as with the evidence of Stansbury's abuse of Falconer's pets, Stansbury opened the door to the majority of the evidence regarding his mental illness and anger management issues. As previously noted, Stansbury put his character at issue when he questioned Falconer about his care of her pets. That questioning, apparently designed to paint Stansbury as a kind and caring person, opened the door to the Commonwealth asking about Stansbury's difficulty controlling his anger, a door that Stansbury opened wider when he elicited testimony from King that Stansbury cared for and babied Falconer. Finally, although he did so after Falconer had raised the issue, Stansbury directly questioned King about mental illness, further emphasizing that issue. As previously noted, once Stansbury opened the door, he cannot complain if the Commonwealth walked through it. Furthermore, although this testimony could have been excluded, Stansbury has not shown how its admission amounted to error so flagrant as to render the trial fundamentally unfair.

As to local and general prejudice, Stansbury cites primarily to *Taulbee v. Commonwealth*, 438 S.W.2d 777 (Ky.1969) and *Perdue v. Commonwealth*, 916 S.W.2d 148 (Ky.1995). Neither citation is helpful to Stansbury's argument.

In *Taulbee*, the Commonwealth stated in closing argument:

> What do we have here? We have an attorney from Winchester representing a client in a case of thieving ... I don't

know what the jury thinks, that is your own business, but I think that is enough. *I just hope if the jury turns him loose that he leaves and that he won't be back here in Estill County robbing and stealing from our people over here.*

*Id.* at 778 (emphasis added).

In *Perdue*, the Commonwealth stated in opening statement:

I believe Cynthia Moore will testify that Frank had said they had brought [the victim] here to Russell County because you could get away with murder in Russell County. So they came here, to our Russell County, for this murder to take place ... [w]hat does this man think? Does he think that a jury in Russell County is going to let him get by with this? No.

916 S.W.2d at 155. Taulbee and Perdue both argued that the preceding amounted to prosecutorial misconduct.

Here, the Commonwealth did comment about testimony regarding Stansbury's mental illness and anger management issues during closing argument. However, Stansbury did not argue in his brief that the Commonwealth's closing argument or opening statement amounted to prosecutorial misconduct. Therefore, neither *Taulbee* nor *Perdue* have any direct application to this appeal.

Furthermore, while we held in *Taulbee* that the Commonwealth's appeal to local prejudice amounted to reversible error, Taulbee had preserved the issue for our review. On the other hand, the defendant in *Perdue*, like Stansbury, did not preserve the issue for review. And, although we found the prosecutor's comments in *Perdue* to be similar to those made in *Taulbee*, we held that, because "there was no objection, we [could] not say that the jury might have been persuaded to find [Perdue] not guilty of these crimes but for the offensive statements." 916 S.W.2d at 155. As we

did in *Perdue* we cannot say that the jury here might have been persuaded to find Stansbury not guilty had the Commonwealth not asked the questions it did.

Finally, we note Stansbury's argument that, even if the jury could have convicted him absent the complained of questioning, that questioning so inflamed the jury that it recommended two concurrent life sentences. Because we are reversing on the issue of Stansbury's sentencing, this issue is now moot.

**D. Admission of Evidence During the Sentencing Phase Resulted in Palpable Error.**

■ During the sentencing phase, the trial court admitted Commonwealth's Exhibits 24, 25, and 26. Exhibit 24 showed Stansbury's judgment and sentence in Bell Circuit Case No. 06–CR–290. The second page stated that Stansbury had been ordered to "pay restitution in the amount of $225.00 on behalf of the victim, Chadwell's Shoe Shop." Chadwell's Shoe Shop is located in Middlesboro, Kentucky, which is in Bell County. Exhibit 25 showed Stansbury's judgment and sentence in Bell Circuit Case No. 06–CR–303. The second page stated that Stansbury had been ordered to "pay restitution in the amount of $60.00 on behalf of the victim, Sew Fine Sewing Shop." At the time, Sew Fine Sewing Shop was also located in Middlesboro, Kentucky. Exhibit 26 showed Stansbury's judgment and sentence in Bell Circuit Case No. 06–CR–308. The first page showed that Stansbury was charged with three counts of Wanton Endangerment in the First Degree, which were all dismissed as a part of a plea agreement.

This issue is unpreserved and therefore reviewed for palpable error under RCr 10.26. Stansbury argues that the trial court committed palpable error when it

allowed victims' names and evidence of a dismissed charge to be entered into evidence. The Commonwealth responds that no palpable error occurred.

■■■ KRS 532.055 states: "Evidence may be offered by the Commonwealth relevant to sentencing including: (1) Minimum parole eligibility, prior convictions of the defendant, both felony and misdemeanor; and (2) The nature of prior offenses for which he was convicted." However, "[t]he trial court should avoid identifiers, such as naming of victims, which might trigger memories of jurors who may—especially in rural areas—have prior knowledge about the crimes." *Mullikan v. Com.*, 341 S.W.3d 99, 109 (Ky.2011).

We held in *Webb v. Commonwealth*, 387 S.W.3d 319, 330 (Ky.2012) that introducing improper evidence during the penalty phase such as "highly prejudicial information concerning the victims of the prior crimes" is a "prejudice ... so egregious as to have resulted in manifest injustice, in that failure to correct the error would seriously affect the fairness, integrity, and public reputation of the judicial proceeding." *Id. quoting Mullikan*, 341 S.W.3d at 109.

Stansbury also argues it is not only reversible error to admit the victims' names, especially in rural areas, but also reversible error to admit evidence of charges that were dismissed or set aside. In *Blane*, we held:

> Nothing in KRS 532.055(2)(a) permits a jury to hear evidence during the penalty phase of prior charges that have been amended—it is only permitted to hear

evidence of the nature of the prior offenses for which [the defendant] was *convicted.* KRS.055(2)(a)(2) ... And we have recognized that it is also well settled that the Commonwealth cannot introduce evidence of charges that have been dismissed or set aside.

*Blane v. Com.*, 364 S.W.3d 140, 152 (Ky. 2012) *quoting Cook v. Commonwealth*, 129 S.W.3d 351, 365 (Ky.2004) (emphasis added and internal quotations omitted). Further, we held "introducing the original charges of Appellant's prior convictions constitutes palpable error in that it affected a substantial right to due process, resulting in a manifest injustice." *Id.*

The Commonwealth acknowledges Stansbury's cited cases; that Stansbury's victims' names and dropped charges were admitted into evidence; and responds to these arguments with one, unreported case—*Handle v. Commonwealth*, No. 2012–SC–000374–MR, 2013 WL 6729962, at *8–10 (Ky. Dec. 19, 2013). *Handle* is not persuasive. In *Handle*, the Commonwealth introduced evidence of prior misdemeanor charges that had been merged into felony charges. We determined that introduction of those misdemeanor charges did not amount to palpable error. *Handle* is not persuasive for two reasons.

First, unreported cases should not be cited to this Court unless there is no standing authority on point. CR 76.28(4)(c) [2]. That is not the case here. We have good, clear, published case law wherein we have repeatedly advised the Commonwealth to stop introducing the very type of evidence in question here.

---

**2.** "Opinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of this state; however, unpublished Kentucky appellate decisions, rendered after January 1, 2003, may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court. Opinions cited for consideration by the court shall be set out as an unpublished decision in the filed document and a copy of the entire decision shall be tendered along with the document to the court and all parties to the action."

Furthermore, we have held that disregarding this advice amounts to palpable error.

Second, *Handle* is not analogous to Stansbury's case because, in *Handle,* the Commonwealth introduced not only several dismissed misdemeanors but eight prior convictions of threats of violence, 10 counts of possession of a forged instrument, complicity to commit second-degree burglary, criminal possession of a forged instrument, terroristic threatening, theft by deception, driving under the influence (DUI), and harassment. We determined that, in the face of this overwhelming history of significant criminal behavior, the admission of several dismissed misdemeanors could have had little bearing on the jury. Here, however, Stansbury's only prior convictions consisted of two counts of third-degree burglary and third-degree criminal mischief and one count each of third-degree assault and third-degree arson. We cannot say that introduction of the dismissed wanton endangerment charge, which was filed in conjunction with the assault and arson charges, did not have an impact. Furthermore, we cannot say that the introduction of the identities of local victims with whom the jurors might have had a connection did not have an impact.

Because the Commonwealth has again introduced inadmissible penalty-phase evidence, we reverse and remand for a new sentencing trial to remedy a manifest injustice.

## IV. CONCLUSION.

For the foregoing reasons, we affirm Stansbury's convictions but reverse and remand for a new sentencing trial.

Minton, C.J.; Abramson, Cunningham, Keller, Noble and Venters, JJ., sitting. Minton, C.J.; Abramson, Noble and Venters, JJ., concur. Cunningham, J., concurs in part and dissents in part by separate opinion.

CUNNINGHAM, J., CONCURRING IN PART AND DISSENTING IN PART:

I believe that the trial court's restriction upon the cross examination by the defense attorney of the arson expert was error. However, I think such error was harmless. Therefore, I concur in the result of that part of the opinion.

The identity of the victims in the prior Bell County thefts as well as the dismissal of three wanton endangerment charges were introduced as part of the prior conviction evidence in the sentencing stage. However, this error was not preserved. I strongly disagree that it was palpable error. I dissent in reversing the sentencing phase.

Therefore, I respectfully concur in affirming the conviction but dissent in the part reversing the sentencing phase of the trial.