# IMPORTANT NOTICE
## <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

# Supreme Court of Kentucky

2018-SC-000565-MR

SALEM NAGDY                                                          APPELLANT

ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.                   HONORABLE MITCH PERRY, JUDGE
NOS. 16-CR-3353 & 18-CR-872

COMMONWEALTH OF KENTUCKY                                             APPELLEE

## MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Salem Nagdy was convicted of one count of kidnapping resulting in serious physical injury, one count of first-degree assault, one count of second-degree stalking, and one count of eavesdropping. He now appeals his resulting thirty-one-year sentence. After review, we affirm.

## I. FACTUAL BACKGROUND

Nagdy is an Egyptian American with dual citizenship. He was born and raised in Egypt but moved to the United States in the mid-nineties when he was in his early twenties. In April 2002 he married his now ex-wife Mary.[1] They had five children together during their fourteen-year marriage. Mary and Nagdy are both followers of the Islamic faith.

In October 2015 Mary informed Nagdy that she wanted a divorce, and the divorce was finalized in March 2016. Mary received full custody of the

---

[1] Because the facts of this case involve domestic violence, the victim will be referred to using a pseudonym.

1

children, and Nagdy was granted visitation rights. In addition, the court entered a protective order against Nagdy requiring him to remain 300 feet away from Mary for a year. They agreed to communicate about matters concerning their children through text message.

But Nagdy refused to accept the legitimacy of the divorce decree. Shortly before October 8, 2016, Mary changed her relationship status on social media to reflect that she was in a new relationship. Although she blocked Nagdy from being able to view her profile, he was able to take a screenshot of her changed relationship status and send it to her via text. The texts that followed the screenshot became increasingly more threatening. He told her she was still his wife under Islamic law and that she was an evil, disobedient wife. He also told her that he prayed to Allah to make her suffer for what she was doing to him and their children. Mary testified that she believed the texts were threats, and she was scared that he would hurt her or someone she loved. Nagdy was also routinely placing a recording device in Mary's van in an effort to discover with whom she was in a relationship.

On October 10th Mary came home from the grocery store at about 8:30 pm. As she was getting the groceries out of the vehicle she looked up and saw Nagdy come around the side of her van and open the driver's side door. It was the first time she had seen him since the protective order was entered. Mary ran into the house and texted him that he needed to leave, or she was going to call the police. Mary testified he did this to intimidate her; to show her he was not going to follow the court's orders.

2

October 19th began as a normal day for Mary. She woke up early, took her children to school, and went back home to get ready for work. Interstate 64 (I-64) was part of her commute, and when she merged onto I-64 she heard something in the back seat of her van. She looked up and saw Nagdy in her rearview mirror. He yelled at her to keep driving, but instead she pulled the car over to the shoulder and stopped. She then tried to exit from the driver's side door, but it would not open though she never had trouble opening the door before that day, and investigators later confirmed the door would not open from the inside. When Mary realized the driver's side door was not going to open, she tried to get out of the passenger's side door. Nagdy then stunned her with a flashlight that had a stun gun feature. Mary testified she felt a sharp pain in her back and was thereafter unable to move or defend herself. Nagdy demanded that Mary tell him with whom she was in a relationship. When Mary refused, he began beating her over the head with the flashlight.

After beating her about her head, Nagdy drove the van to Norton Women's and Children's Hospital in Louisville (Norton Hospital). Mary was conscious when she arrived, but was unable to speak. As a result, the attending nurses were unable to get a medical history from her. Nagdy lied and told them they had been in a car accident. However, after the staff observed a large amount of blood on the interior of the car, but no exterior damage, they called the police. Investigators from the St. Matthews Police Department arrived, questioned Nagdy, and arrested him shortly thereafter.

3

Meanwhile, because it was clear Mary had endured major head trauma, a CT scan was conducted. The scan revealed multiple skull fractures and bleeding on the brain. She was immediately transported to the University of Louisville Hospital's Trauma Center for surgery. Mary's skull had to be surgically repaired, and she had ten lacerations on her head and face that required a total of eighty staples.

At trial Nagdy presented an extreme emotional disturbance (EED) defense and testified on his own behalf. He stated that it was shameful for a Muslim man to have another man raise his children, and that when a Muslim woman divorces her husband and remarries someone else, she must give the children to their biological father. He admitted that he attacked Mary, but said he was not in his right state of mind when it occurred. He further claimed that he attacked Mary to protect his children. Nagdy also testified that he believed that his marriage to Mary under Islamic law was still intact, the divorce decree notwithstanding.

Finding that Nagdy was not acting under EED, the jury instead found him guilty of kidnapping resulting in serious physical injury, first-degree assault, eavesdropping, and second-degree stalking. The jury recommended, and the court imposed, a twenty-year sentence for kidnapping, ten years for first-degree assault, and one year for eavesdropping to run consecutively for a total for thirty-one years.[2]

---

[2] The parties agreed to thirty-days time served for the stalking conviction. That sentencing determination was not submitted to the jury.

Additional facts are discussed below as necessary.

## II.  ANALYSIS

Nagdy asserts six alleged errors on appeal to this Court.  First, that the trial court erred by allowing testimony by an investigating officer that Nagdy said he hated this country.  Second, that the trial court erred by allowing evidence that Nagdy was being investigated by another law enforcement agency for possible terrorist activity.  Third, that the trial court erred by answering a jury question posed during guilt phase deliberations outside Nagdy's presence and not in open court on the record.  Fourth, that the trial court erred by allowing thirty photographs of Mary's injuries into evidence.  Fifth, that the trial court erred by allowing Nagdy's confession into evidence.  Finally, that the trial court erred by allowing evidence that Nagdy had sought a new wife in Egypt.

### A. The trial court did not err by allowing Nagdy's statement that he "hated this country" into evidence.

Nagdy's first argument is that the trial court erred when it permitted one of the investigating officers to testify that Nagdy told him that he wanted to take his wife and children and leave this country and that he hated this country.[3]

Because this alleged error concerns the admission of evidence, we review the trial court's ruling for abuse of discretion.[4]  A trial court abuses its

---

[3] This alleged error was preserved by Nagdy's contemporaneous objection to the evidence being admitted.  Kentucky Rule of Criminal Procedure (RCr) 9.22.

[4] *Holt v. Commonwealth,* 250 S.W.3d 647, 652 (Ky. 2008).

discretion when its ruling is arbitrary, unreasonable, unfair, or unsupported by sound legal principles.[5]

Nagdy asserts that this evidence was not relevant and that its probative value was substantially outweighed by its prejudicial effect in violation of KRE[6] 403. After reviewing the testimony, we disagree.

Detective Mark Richardson testified that he questioned Nagdy at Norton Hospital prior to his arrest. The Commonwealth asked if Det. Richardson heard Nagdy make any statements about living in the United States. Before he could respond defense counsel objected. Nagdy argued then, as now, that his statement that he hated this country was not germane to any issue in the case and was highly prejudicial. The trial court disagreed and found that, because the case involved conflicts between American and Islamic divorce law, it was relevant evidence. The court allowed Det. Richardson to answer. Det. Richardson stated that Nagdy "made a spontaneous and unprovoked statement [that] he wanted to take his wife and children and leave this country. Then he stated that he hated this country and made another statement that he wanted to leave this country."

We hold that the trial court did not abuse its discretion in allowing this statement into evidence. As previously stated, Nagdy never denied attacking Mary and instead focused on proving that his actions were the result of EED. Thus, his mental state when he attacked Mary was the predominant issue the

---

[5] *Commonwealth v. English,* 993 S.W.2d 941 (Ky. 1999).

[6] Kentucky Rule of Evidence.

jury had to determine. His statement that he hated this country made it more probable, even if only slightly,[7] that his attack on Mary was not the result of a temporary state of mind so enraged, inflamed, or disturbed that it overcame his judgment.[8] His expression of his disdain for the country, and perhaps its divorce laws, was probative.

Further, this testimony clearly did not "provoke the jury's instinct to punish" as Nagdy argues under *Richmond v. Commonwealth.*[9] Kidnapping that results in serious physical injury to the victim carries a minimum punishment of twenty years, and a maximum punishment of life imprisonment.[10] Here, the jury recommended the minimum of twenty years. It also recommended minimum sentences for his first-degree assault and eavesdropping convictions. And, though the jury recommended that his sentences run consecutively, the maximum term of years for a consecutive verdict is seventy years[11] and Nagdy was sentenced to only thirty-one.

## B. The trial court did not err by allowing the lead investigator to explain why he asked Mary questions regarding possible terrorist activity by Nagdy.

Nagdy argues next that the trial court erred by allowing evidence that Nagdy was being investigated by another law enforcement agency for possible terrorist

---

[7] *Smith v. Commonwealth,* 454 S.W.3d 283, 286 (Ky. 2015).

[8] *McClellan v. Commonwealth,* 715 S.W.2d 464, 468 (Ky. 1986).

[9] 534 S.W.3d 228, 232 (Ky. 2017) (holding "[e]vidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case is unfairly prejudicial").

[10] *See* Kentucky Revised Statute (KRS) 509.040(2); KRS 532.060(2)(a).

[11] KRS 532.110(1)(c).

activity.[12] Again, we review alleged errors regarding the admission of evidence for abuse of discretion. We hold that Nagdy's counsel opened the door to this evidence as part of his trial strategy, thus the trial court did not abuse its discretion.

During the Commonwealth's direct examination of the lead investigator, Detective Jeff May, he was not asked any questions about Nagdy's possible terrorist activity. But during the defense's cross-examination of Det. May, counsel asked about Det. May's interview with Mary after she recovered from surgery. Specifically, defense counsel inquired as to whether Det. May remembered asking Mary about whether Nagdy visited any terrorist websites, whether or not he owned a storage locker, and whether he had a pilot's license or flight certification. Initially Det. May said he did not remember but acknowledged that Mary's interview was recorded, and it was certainly possible that he did.

Defense counsel thereafter requested a side bench. He sought to play those portions of the interview for Det. May out of the jury's presence to refresh his memory and obtain a solid "yes or no" answer. The trial judge stated he was not sure where defense counsel was going but allowed it. After the statement was played for Det. May, the court asked the Commonwealth if it had any objections. She responded that she believed the defense was bringing this information up at its own peril, and that she would ask Det. May on re-

---

[12] This error was preserved by Nagdy's contemporaneous objection to the evidence. RCr 9.22.

direct to explain why he asked Mary those questions. The trial court agreed that was appropriate.

When the cross-examination resumed, defense counsel asked Det. May if he remembered asking those questions, and Det. May said that he did. On re-direct the Commonwealth asked Det. May why he asked Mary those questions. Det. May began to respond, "my partner received information after Mr. Nagdy's arrest from a storage facility manager and he stated that..." At that point defense counsel made an objection on hearsay grounds. The trial court responded:

> counsel you invited every bit of this and for the life of me I have no idea why. He can explain the nature of the conversation. It's not even being offered for the truth of the matter asserted. It's just to put into context whatever you're doing. So, the truth of what the storage manager said is not in issue in this case. Neither is terrorism, by the way. I'm not sure what's going on so I'm going to let him explain[.]

Thereafter Det. May responded,

> During the course of our investigation we received information that Mr. Nagdy had a storage locker in Oldham County. That storage locker had been cleaned out, and the material in it had been placed into a dumpster. The manager found it, was concerned about it, saw the news story about this incident on the 19th, called the St. Matthews Police Department, and told us about the box. [My partner] went and recovered the box, looked at its contents, and we had some significant concerns that those type of questions needed to be asked. And ultimately, that information was passed along to other agencies.

It was not until the defense's closing argument that the reason for this curious strategy became clear. Counsel argued,

9

during Detective May's testimony there were some questions that came up about a possible link to terrorism websites, questions about Salem's pilot's license, things like that. At first Det. May claimed he didn't remember asking those questions, but once his recollection was refreshed, he did. Why is that information important? I'll tell you why it's important. Because the Commonwealth, in this case, in this courtroom there is a brown skinned man sitting here from a middle eastern country. And the Commonwealth is not going to understand that he was acting under extreme emotional disturbance that day. They have to suspect that maybe he's a terrorist because they can't understand him. He told them what he did. If he was a terrorist, he would have been charged.

It is clear that defense counsel solicited this irrelevant testimony to diminish the credibility of the investigating officers by making them appear prejudiced towards Muslim citizens of middle eastern origin. Attempting to hurt the credibility of a witness is a common and often utilized trial strategy. And, "[i]n the absence of exceptional circumstances, a defendant is bound by the trial strategy adopted by his counsel[.]"[13]

As to redirect, the defense opened the door for this evidence to come in. "When one party introduces improper evidence, such 'opens the door' for the other party to introduce improper evidence in rebuttal whose only claim to admission is that it explains or rebuts the prior inadmissible evidence."[14]

We therefore hold that the trial court did not abuse its discretion by permitting Det. May to explain this portion of his investigation.

---

[13] *Salisbury v. Commonwealth*, 556 S.W.2d 922, 927 (Ky. App. 1977).

[14] *Stansbury v. Commonwealth*, 454 S.W.3d 293, 300 (Ky. 2015).

10

## C. The trial court's violation of RCr 9.74 was harmless error.

For his third argument Nagdy asserts that the trial judge answered a guilt phase deliberation jury question out of Nagdy's presence. Counsel concedes this issue is unpreserved but has requested palpable error review under RCr 10.26. This Court may therefore only grant Nagdy's request for a new trial as a result of this alleged error if it holds that a manifest injustice has resulted from it.[15]

After the jury retired to deliberate during the guilt phase of Nagdy's trial, it sent the following question to the trial judge: "was it admissible for the prosecution to present evidence of previous violent acts the defendant has committed?" After consulting with defense counsel and the Commonwealth, the court sent back: "the Court cannot answer this inquiry." While there is no video record of this exchange, both parties agree Nagdy was not present during the discussion.

The statute at issue, RCr 9.74, commands that:

> [n]o information requested by the jury or any juror
> after the jury has retired for deliberation shall be given
> except in open court in the presence of the defendant
> (unless the defendant is being tried in absentia) and
> the entire jury, and in the presence of or after
> reasonable notice to counsel for the parties.

Thus, the trial court clearly violated RCr 9.74 by failing to ensure Nagdy was present for the discussion and subsequent answer. However, as the trial court

---

[15] "A palpable error which affects the substantial rights of a party may be considered...by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error." RCr 10.26.

11

was unable to answer the jury's question and correctly responded as such, we cannot hold that a manifest injustice resulted. Accordingly, we decline Nagdy's request for a new trial because of this error, which we hold was harmless.

## D. The trial court did not err by admitting thirty photographs comprising the Commonwealth's collective exhibit four.

Nagdy next argues that he is entitled to a new trial because the trial court erred by admitting thirty photographs of Mary's injuries after her cranial surgery.[16]

The sexual assault and domestic violence nurse examiner that took photographs of Mary following her surgery testified at trial. During her testimony the Commonwealth sought to introduce thirty photographs of Mary's injuries taken by the nurse. Twenty-seven of the photographs show the ten separate stapled lacerations to Mary's shaved head, as well as her ear which had gauze surgically attached to it. The remaining three photographs showed the roughly lemon-sized bruise on Mary's back caused by the stun gun. The nurse explained that when taking forensic photographs it is her practice to take three photographs of an injury: one orientation photograph so that the viewer can identify where on the victim's body the injury is located; one close up photograph of the injury; and one close up photograph with a scale, in this case a ruler. Some of the injuries, such as the cut on Mary's forehead and the

---

[16] This alleged error was preserved by defense counsel's contemporaneous objection to the evidence. RCr 9.22. Nagdy also argues for the first time that Commonwealth's collective exhibit two was incorrectly admitted. Commonwealth's exhibit two was ten pictures of Mary when she first arrived at Norton Hospital prior to surgery. As he made no objections at trial, and in fact went so far as to distinguish exhibit two from exhibit four in terms of admissibility, we decline to address the argument.

largest of the stapled wounds are depicted with three separated photographs in this way. But, as three photographs of each of the eleven injuries to her head and ear does not equal twenty-seven photographs total, not every injury was demonstrated by using three separate photographs.

Prior to these photographs being discussed by the nurse, defense counsel objected to their admission. He argued under *Hall v. Commonwealth*[17] that photographs were prejudicial because they went above and beyond what was necessary to prove the injury. The trial court allowed the photographs to be introduced based on its finding that:

> there are not duplicate photographs, there's just photographs of the same thing with different frames of reference. I don't see a problem with that. I understand [the defense's] request. It's not unlike an autopsy photo that goes too far, it can go too far, but in my view this does not.

In his argument to this Court Nagdy again argues under *Hall* that these photographs were admitted in error. We address this argument by noting first that *Hall* mandated our trial courts to first conduct a KRE 403 balancing test before ruling on the admissibility of an arguably gruesome photograph.[18] In other words, a trial court must assess the probative value of each photograph against its possible prejudicial effect and determine whether its possible prejudicial effect is substantially outweighed by its probative value.[19]

---

[17] 468 S.W.3d 814 (Ky. 2015).

[18] *Id* at 823.

[19] KRE 403.

13

To that end, we start with the well-established rule that photographs of a gruesome or graphic nature are not rendered inadmissible solely because of their graphic nature.[20] "And to keep out relevant yet gruesome evidence, the gruesomeness must be such that it creates substantial undue prejudice or other harmful consequences that outweigh the probativeness of the evidence."[21] Finally,

> photos showing the nature of the victim's injuries and the circumstances surrounding the commission of the crime will rarely be deemed inadmissible. The Commonwealth has the burden of proving a crime beyond a reasonable doubt. Consequently only minimal probativeness to a fact of consequence is necessary for evidence to be relevant and thus generally admissible unless excluded by Constitution (federal or state), statute, or other evidentiary rule.[22]

In this case, the photographs of Mary's injuries most certainly had probative value. When there is a wound to one's head, if covered with hair, injuries are difficult to discern. The first set of photographs, Commonwealth's exhibit two, showed Mary's bloody head with her long hair still in place. The second set of photographs, Commonwealth's exhibit four, showed her wounds more clearly, but neatly stapled and not gruesome in any way. In order to convict Nagdy of both kidnapping resulting in serious physical injury and first-degree assault, the Commonwealth had to prove beyond a reasonable doubt that Mary suffered serious physical injury in accordance with KRS

---

[20] *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992).

[21] *Ragland v. Commonwealth*, 476 S.W.3d 236, 248 (Ky. 2015) (internal quotations omitted).

[22] *Easterling v. Commonwealth*, 580 S.W.3d 496, 509 (Ky. 2019) (internal cite and quotations omitted).

14

500.080(15).[23] This means a "physical injury which create[d] a substantial risk of death, or which cause[d] serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ." This is not a low water mark. These photographs helped the Commonwealth demonstrate the full extent of Mary's injuries. Thus, their probative value was distinctly high.

On the other side of the KRE 403 coin, the photographs, while not particularly pleasant to look at, are in no way in the "upper echelon of gruesome photos"[24] such as the ones at issue in *Hall*. Again, twenty-seven of the photographs depict clean, stapled wounds post-surgery on a live person, not mangled corpses at the scene of a double murder in addition to graphic autopsy photos.[25] Consequently, any prejudicial effect they may have had did not substantially outweigh their probative value.

We therefore hold that the trial court did not err in admitting the photographs and decline Nagdy's request for a new trial based on this error.

**E. The trial court did not err by denying Nagdy's motion to suppress.**

Nadgy's next assertion is that the trial court erred by failing to grant his motion to suppress recordings of him made by Det. May.

At the suppression hearing Det. May testified that he made three audio recordings the day of the incident. He made the first when he arrived at Norton Hospital while observing Nagdy's interactions with hospital staff. He did not

---

[23] *See* KRS 509.040(2) and KRS 508.010, respectively.

[24] *Hall*, 468 S.W.3d at 827.

[25] *See id.* at 821-22.

15

speak to Nagdy at that time. The second was made a short time later when Det. May questioned Nagdy in his hospital room. Det. May said that his initial goal was to figure out what happened because Mary was still unable to speak. Nagdy eventually told Det. May that he and Mary got into an argument and he struck her. At that point Det. May advised him of his rights and continued his questioning. Based on that questioning, which lasted between ten and fifteen minutes, Nagdy was arrested. After he was medically released with no injury, he was immediately taken to the St. Matthew's Police Station, mirandized, and questioned again. That interrogation lasted about an hour. During both the initial questioning and the interrogation Nagdy indicated that he understood his rights and did not invoke his right to remain silent or his right to an attorney.

Dr. Christopher Krieg was the emergency room physician that treated Nagdy that day. Dr. Krieg testified that when Nagdy came in he was screaming, crying, breathing fast, sweating, and was covered in blood. He was abrasive and uncooperative with the staff and refused to answer questions they were asking to try and determine what happened and if he was injured. He started getting physically aggressive and was trying to leave. Dr. Krieg testified he was growing more concerned about the safety of himself and his staff. Dr. Krieg ordered that Nagdy be given 2 mg of Ativan and 5 mg of Geodon. Nagdy now argues that the effects of the medicines prevented his statements to Det.

16

May from being freely, knowingly, and voluntarily given in violation of *Miranda v. Arizona.*[26]

Dr. Krieg testified that the two medicines are not sedatives. Rather, Ativan is an anxiolytic,[27] and Geodon is an antipsychotic that is also used to treat bipolar disorder. He stated that 2 mg of Ativan is considered a low dose, and that the most common side effects associated with 2-4 mg of Ativan are sleepiness, decreased anxiety, slowed breathing, and, rarely, seizures. He agreed that at high doses it can cause memory loss, but he had never seen it happen to a patient because his practice only involves administering low doses. The Geodon was also administered at a low dose, as 5 mg is a quarter of the maximum allowable dosage. The most common side effects Dr. Krieger had observed from Geodon were tardive dyskinesia, *i.e.* twitching facial muscles, calmness, and sleepiness. He had never seen memory impairment occur with someone given Geodon. Further, many people take low doses of one or both medications daily and live normal lives.

More importantly, Dr. Krieg testified that after Nagdy was given the drugs he became calm but was still alert and began cooperating with the medical examination. This was his intended effect. Det. May similarly testified that Nagdy did not appear to be under the influence of anything. Nagdy seemed to understand Det. May's questions, and responded with coherent, logical, and

---

[26] 384 U.S. 436 (1966).

[27] A drug that relieves anxiety. https://www.merriam-webster.com/dictionary/axiolytic (last visited March 7, 2020).

appropriate responses. Additionally, his answers during both rounds of questioning were consistent with one another.

Nagdy testified that his recollection of Dr. Krieg was vague, that he did not remember seeing Det. May at any time prior to the probable cause hearing. Nagdy testified that he did not remember being at the St. Matthews Police Station, and that after he was injected with the medicines the next thing he remembered is waking up in jail.

Based on the foregoing, as well as his review of the three recordings themselves, the trial judge denied Nagdy's motion to suppress. Nagdy requests that this Court hold that this was done in error and reverse his conviction.

We review a trial court's ruling on a motion to suppress evidence under a two-step analysis.[28] "We review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence. The trial court's application of the law to the facts we review de novo."[29]

For whatever reason, we are without the benefit of a written order on this issue.[30] We will therefore review the trial court's oral ruling. Prior to jury selection the first day of trial the Commonwealth requested a ruling on the suppression motion. The trial court stated:

> I'm going to respectfully deny the motion. I listened to
> all of the statements. I believe Mr. Nagdy's comments

---

[28] *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011).

[29] *Id.*

[30] The trial court indicated after its oral ruling that it would prepare an order. We have no reason to doubt that said order was prepared, but it is absent from the record before us.

18

at the hospital, the first one was not a custodial interrogation, I'm not even sure [defense counsel] was asking me to suppress that one. But the second two, once law enforcement was on notice of a possible crime [Nagdy] was mirandized and I believe he freely, knowingly, and voluntarily waived his Fourth Amendment rights there. And certainly at the station house as well. So I'm going to respectfully deny the motion to suppress[.]

We find no error in this ruling. The trial court was correct that the first recording was not a custodial interrogation. The recording was made by Det. May while he was merely observing Nagdy interact with hospital staff. Nagdy was not in custody and Det. May did not question him at that time.[31] Regarding the second and third recordings, Nagdy was advised of his rights after he stated that he struck Mary. Additionally, Dr. Krieg testified that the drugs he prescribed would not cause memory loss at the dosage levels he administered to Nagdy. And after Nagdy was administered those drugs he became calm, but alert. Dr. Krieg did not witness any side effects that concerned him. Det. May testified similarly that Nagdy's demeanor did not cause him to believe he was under the influence of anything, and in fact did not even know he was given anything until the day before the suppression hearing. This evidence is more than sufficient to support the trial court's determination that Nagdy gave his statements freely, knowingly, and voluntarily.

## F. The trial court did not err by allowing evidence that Nagdy sought an additional wife in Egypt.

---

[31] *Jackson v. Commonwealth*, 468 S.W.3d 874, 876 (Ky. App. 2014) ("A custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").

19

Nagdy's final argument is that the trial court committed reversible error when it allowed evidence that Nagdy sought additional wives in Egypt. He asserts that this was impermissible bad acts evidence in violation of KRE 404(b). He concedes that this error was not preserved, and requests palpable error review under RCr 10.26. As previously stated, this Court may only reverse a conviction under palpable error review if a manifest injustice has resulted from the alleged error.[32]

The subject of Nagdy seeking an additional wife was not broached by the Commonwealth at any time during its direct examination of Mary. It was in fact the defense that opened the door to that information. During its cross-examination of Mary, the defense brought up a written "contract" between Mary and Salem from 2014. In that agreement, Mary agreed to not get an Islamic divorce if Nagdy agreed to a legal divorce. On re-direct the Commonwealth had Mary read the terms of the agreement out loud. One of the terms was that "Salem will not go online to pursue other wives. Salem will go overseas to Egypt to pursue a wife that will not create fitnah, or jealously, between her and Sundus[33]." The defense did not object. The reason for the defense's lack of objection became clear during its later direct examination of Nagdy. Again, the defense brought up the agreement and Nagdy himself testified that the contract was Mary's idea and that Mary urged him to go to Egypt in 2015 and find a new wife that would remain in Egypt.

---

[32] RCr 10.26.

[33] Mary's nickname.

20

Thus, not only did the defense open the door to the information contained in the "contract" between Mary and Nagdy, but it also later used that information as part of its trial strategy. As previously discussed, defendants are bound by the trial strategy of their counsel.[34] We therefore hold that the trial court did not err by allowing evidence that their contract addressed Nagdy seeking an Egyptian wife.

## III.   CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Euva D. May
Assistant Appellate Defender
Louisville Metro Public Defender's Office

Leo G. Smith
Louisville Metro Public Defender
Louisville Metro Public Defender's Office

COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

Jeffrey A. Cross
Assistant Attorney General

---

[34] *Salisbury*, 556 S.W.2d at 927.