# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: APRIL 18, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0568-MR

JOSHUA AUSTIN WARD                            APPELLANT


ON APPEAL FROM BOONE CIRCUIT COURT
V.          HONORABLE RICHARD A BRUEGGEMANN, JUDGE
NO. 18-CR-00483


COMMONWEALTH OF KENTUCKY                APPELLEE


**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Joshua Austin Ward appeals from his concurrent life sentences without the possibility of parole imposed by the Boone Circuit Court following a jury trial in which he was convicted for the murders of Kelli Kramer (his former girlfriend) and her nine-year-old son, Aiden Kramer. Ward argues errors regarding denial of his right to present a defense in his role as hybrid counsel, denial of his motion *in limine* to limit the firearm toolmark examiner's testimony, the offering of improper opinion testimony regarding a surveillance video, impermissible comments on his right to silence involving access to his cell phone, flagrant prosecutorial misconduct during closing argument, and denial of a directed verdict. We affirm because while errors occurred, they were either harmless where preserved or not palpable when unpreserved. We regretfully cannot address the argument regarding the firearm toolmark

examiner's expert testimony where the defense never requested a hearing pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ward was convicted of these murders partially based on firearm toolmark identification involving shell casings.[1] A firearms toolmark examiner,[2] Jennifer Owens, testified that nine .22 caliber shell casings found at the murder scene and two .22 caliber shell casings found at a farm where Ward target shot a year prior, were fired from the same firearm. Other evidence provided support for the jury to convict Ward but was not as definitive.

Although Ward was married, he was involved in an unusual polyamorous lifestyle. Ward desired to be the dominant male over several submissive females forming a family. Ward and his wife Karen were involved in Fetlife, a platform for people with sexual fetishes. Ward used this platform to look for additional girlfriends and to make other social connections.

In 2016 and early 2017, Ward became involved with multiple women he met through FetLife: Diane Christos, Tonya Palmer, and Kramer. Kramer had a checkered past, but Ward was pleased she wished to make some changes in her life for her and Aiden to become part of "the family."

---

[1] To maintain consistency, we shall exclusively use this term. We recognize, however, that various overlapping terms are used interchangeably by experts, courts, scientific journals, the media and parties. These alternative terms include bullet casings, casings, cartridge casings, cartridges, fired cartridges, fired casings, spent cartridges, and spent casings; such terms may appear in sources we quote.

[2] Alternatively, such an expert may be termed a "forensic firearms examiner." These terms are more precise than "ballistics expert" which may encompass other areas of expertise regarding firearms.

Five months into the relationship, in May 2017, Kramer left her cell phone at Ward's home. Ward went through the phone and found messages that he believed established Kramer was prostituting herself. Ward was irate and determined he was "done" with the relationship. Ward contacted Kramer's mother about her behavior, broke up with Kramer in front of her coworkers, publicly shamed Kramer by signing onto her Facebook page and (while posing as Kramer) confessed that she was a prostitute and drug user, and outed the behavior of one "John" by messaging his family members.

Twice in May 2017, Ward drove to Kramer's parents' house and waited for Kramer without seeing her. According to Ward, he wanted to talk to Kramer about seeing Aiden but he gave up on the idea based on email exchanges they had later. Ward denied ever seeing Kramer again after he broke up with her in May 2017, or ever communicating with her after the end of that month.

After the breakup Ward had several conversations with other people, including Christos, Palmer, Adrienne Fiely, and Nicole Bohley, about how angry he was at Kramer for ruining his "family" and discussed how he wanted her to be held accountable. He also made statements about what he wanted to do to Kramer that they found disturbing.

In November 2017, Kramer became involved with another dominant male that she met on FetLife, David Sullivan. Sullivan broke up with his former girlfriend Sigma Novak to focus on his relationship with Kramer.

Novak identified as a "primal" and fantasied about hunting someone down. While dating Sullivan, Novak had a habit of urinating around his home to "mark" her territory.

In February 2018, Novak became aware of Sullivan's new relationship when Sullivan and Kramer attended a "Beat My Valentine" convention together. Novak reacted jealously: she followed Sullivan around the convention and yelled at him, she tracked Kramer down and sent her messages about Sullivan, she contacted Ward about Kramer's new relationship, and she used her children's Facebook accounts to track down Sullivan.

According to Chelsea Ballard, on Tuesday, March 20, 2018, Kramer and Aiden visited Ballard, and Kramer and Ballard jointly bought methamphetamine to resell. Kramer left Ballard's home with Aiden at around 10:00 p.m., stopped at a McDonald's drive-thru at 10:20 p.m. and called Sullivan. At 10:46 p.m. Kramer's phone connected to her Wi-Fi router. Sullivan texted Kramer at 11:11 p.m. asking "You home?" Kramer did not text back.

Sullivan drove to Kramer's apartment, entered it at around 3:30 a.m. and discovered Kramer's and Aiden's bodies in the living room. There were no lights on, and Kramer and Aiden still wore their coats and shoes. Kramer had been shot six times; once in the leg and five times in the head. Aiden had been shot three times, once in the chest and twice in the head.

There were no witnesses to the crime. The only definitive evidence which could connect any of the suspects or other individuals with the murder scene were the nine .22 caliber long rifle shell casings.

Ward agreed to be interviewed by police and voluntarily provided his DNA. Ward denied any involvement in the murders and was candid about the actions he took when he broke up with Kramer.

Possible suspects emerged including Ward, Sullivan and Sullivan's ex-girlfriend, Novak. Kramer's personal lifestyle (which included involvement with prostitution and drugs) and her reports to her friends naming other men as stalkers also suggested that others could be responsible for the murders.

Palmer called a tip line and police learned about the troubling statements Ward had made to various women about Kramer. Police also learned from Sullivan that in December 2017, Kramer had texted him about seeing Ward at the Starbucks where she was working.

Investigators secured a video recording from the Starbucks and identified a man in an orange sweatshirt and hat who they believed was Ward. This led to the theory that Ward had been dishonest in his interview and was stalking Kramer. The Starbucks video was part of the basis for the grand jury returning an indictment.

The police received search warrants for Ward's residence and cell phones. The police did not find the orange sweatshirt from the Starbucks video or any other evidence linking him to the murders. Investigators were unable to access desired information on Ward's current phone as the phone itself had a password and encryption. They also learned Ward used an app called Wickr to protect his data.

Attempting to procure evidence connecting Ward with the murders, the police had Palmer meet with Ward while wearing a wire. Although Ward was clearly suspicious of Palmer's questions, and even checked her for a wire which he did not find, he did not say anything incriminating.

Having learned that in the summer of 2017, Ward target shot with a .22 caliber firearm at Palmer's farm in Ohio, the police searched the farm looking for .22 shell casings they could use to tie Ward to the murders. Investigators collected about twenty-five .22 shell casings from the farm and submitted two of those casings to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) for comparative analysis with the shell casings from the murder scene. Even though the murder weapon was never found, Owens concluded that all eleven shell casings (the nine shell casings from the murder scene and the two shell casings from the farm) came from the same firearm after performing a microscopic firearm toolmark analysis using a split microscope to compare the samples.

Prior to trial, Ward requested he be allowed to proceed with hybrid representation. This motion was granted, and Ward became co-counsel. To avoid confusion, we will generally designate actions taken on Ward's behalf by his attorneys as "the defense" and will reserve use of Ward's name to refer to actions he specifically undertook in his own self-representation at trial.

The Commonwealth Attorney requested via a motion *in limine* that Ward be prohibited from personally examining three witnesses that were afraid of

him (Christos, Palmer and Fiely). Neither defense counsel nor Ward objected to such limitation.

The defense filed a motion *in limine* to prohibit the Commonwealth from having its firearm expert Owens offer opinion testimony that the two sets of shell casings were fired from the same firearm.[3] The defense specifically waived having a *Daubert* hearing but proposed that the certainty of Owen's opinion should be limited further and proposed alternative language for her to use. Ultimately, the trial court determined it was acceptable under existing case law to allow Owens to testify that she believed both sets of shell casings came from the same firearm.

At trial, Owens testified that based on her analysis, all of the shell casings could be identified as having been fired from the same firearm because they had sufficient marks in agreement but acknowledged on cross-examination that her conclusions were subjective. Pictures of the shell casings were admitted into evidence.

Steven Weitz, the chief of the DNA section at the ATF laboratory, testified he tested the shell casings found at the scene for DNA and compared it to DNA samples from Kramer, Aiden, Ward and Sullivan. Weitz testified that the shell

---

[3] Originally, the defense sought to prohibit Owens from: (1) testifying there was a "match" between the shell casings recovered at the scene and the shell casings recovered at the farm; (2) stating her opinion to a degree of statistical or scientific certainty; (3) phrasing her opinion as being "to the exclusion of all other firearms;" and (4) testifying to any conclusion that the shell casings recovered from the scene and shell casings recovered from the farm were fired from the same firearm. During a hearing on this issue, the Commonwealth agreed that Owens would not engage in (1)-(3) but argued Owens could properly testify as to (4).

casings DNA belonged to Kramer, Aiden and a third individual, with at least one of those individuals being a male. He explained that Ward was excluded as being a possible contributor to the DNA profile, but Sullivan could neither be included nor excluded as a contributor. He also testified that there were many reasons why a person's DNA might not be on a shell casing, including that the person wore gloves.

Detective Tony VonDerHaar testified he had recovered and inspected electronic devices belonging to Ward and could not access Ward's current cell phone because it was encrypted.

Detective Chris Hull testified about two black and white poor quality security videos from a Little Caesar's restaurant which were filmed on the night of the murder and admitted into evidence. He narrated what he believed was occurring in the videos and testified to similarities between the "murderer's vehicle" and Ward's vehicle.

During Ward's case-in-chief, Ward requested that counsel recall the Commonwealth's witnesses because he wished to impeach them with inconsistencies. The trial court declined to require counsel to call and question these witnesses and they were not recalled.

Ward testified and denied having any involvement in the murder. He explained his lifestyle and history with Kramer but testified that he had moved on with his life after the breakup, although he still cared about Aiden and had at one time hoped to stay being a part of his life. Ward denied knowing where Kramer lived. He denied leaving his home the night of the murder, explaining

8

that he was ill. He admitted to knowing that Kramer worked at a Starbucks because he had come across her picture in a Starbucks uniform on Tinder, but denied knowing at which location she worked or ever wearing an orange sweatshirt to a Starbucks.

During the cross-examination of Ward, the Commonwealth Attorney asked Ward whether he made it impossible for the police to access his phone. Ward replied that his phone's operation system had inherent encryption but admitted he also had the Wickr app.

Karen testified that on the night of the murders she was working a twenty-four-hour shift and did not return home until the next day but when she returned home Ward's car was covered with four inches of snow. It was established that Ward's cell phone was on and using data within one mile of his home address, which was a forty-five-minute drive from Kramer's apartment.

Regarding the Starbucks video, the defense called Michael Edwards, who was located based on information from Starbucks that he had paid for a drink using the Starbucks app during the relevant time period of the video. Edwards testified he was the man in the video and produced the orange sweatshirt and baseball cap he had been wearing that day. Subsequently, the Commonwealth

more-or-less conceded that it was Edwards and not Ward who was captured on the Starbucks video.[4]

The jury found Ward guilty of both murders and he was sentenced to life in prison in accordance with the jury's recommendation. He appeals to our Court as a matter of right.

Given the concerns Ward raised about the firearm toolmark identification testimony and our understanding that this testimony was the "linchpin" which resulted in Ward's conviction, our Court requested that the parties brief and provide oral argument as to whether we should reconsider our ruling in *Garrett v. Commonwealth*, 534 S.W.3d 217, 222-23 (Ky. 2017), regarding the opinion testimony firearm toolmark examiners can properly provide in identifying samples as having come from the same firearm in light of the report generated by the United States President's Counsel of Advisors on Science and Technology regarding valid forensic science in criminal courts (*PCAST Report*)[5] and subsequent developments. We initially considered this issue preserved due to the motion *in limine*. The parties provided extensive briefing on this issue and vigorously argued their positions during oral argument.

---

[4] During the Commonwealth's closing argument, the Commonwealth Attorney stated that she did not care if the man shown in the Starbucks video was Edwards or Ward because the murder did not happen at the Starbucks.

[5] Executive Office of the President: President's Council of Advisors on Science and Technology, *Report to the President: Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, 104-14 (Sep. 2016), https://obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf (section relating to the validity of firearm toolmark identification).

## II. LEGAL ANALYSIS

Ward raises six issues on appeal which we address in order.

### A. Was Ward Denied his Right to Present a Defense when he was Not Allowed to Recall Witnesses as Hybrid Counsel? — Preserved

Prior to trial, Ward requested and was granted, via a March 12, 2021, written order, the right to "proceed as hybrid counsel throughout this matter." The trial court specifically granted Ward broad powers of self-representation through proceeding as hybrid counsel, specifying:

> [Ward] shall be jointly responsible for cross-examination of all witnesses called by the Commonwealth; and to raise any objections to evidence. [Ward] shall be jointly responsible for deciding whether to produce any witnesses at trial or to introduce any exhibits. . . . It will be [Ward's] joint responsibility to make all strategic decisions which would include whether to testify; to call other witnesses; and, to offer exhibits and other evidence.

Prior to trial, the Commonwealth filed a motion *in limine* to prohibit the examination of Palmer, Christos, and Fiely by Ward personally, explaining these witnesses were afraid of Ward. However, the Commonwealth stated it did not object to Ward "being allowed to prepare questions and consult with co-counsel both before and during the direct or examination of Palmer, Christos, and Fiely." The Commonwealth also noted that it did not object to Ward personally cross-examining other Commonwealth witnesses.

During an October 2, 2021, hearing on this and other matters, Ward and his defense counsel were present. The trial court acknowledged that Ward was hybrid counsel, had counsel enter appearances and then asked about the Commonwealth's motion *in limine* concerning the examination of certain witnesses. The Commonwealth stated that no objection had been received and

11

the defense counsel stated there was no objection. By virtue of the hybrid counsel motion being granted, Ward was on notice that he could participate in his own representation, but Ward did not ask for clarification or contribute in any way.

Later in that same hearing, the trial court stated that it needed the ground rules established for how the hybrid representation would work during trial so there would be no misunderstandings. Defense counsel briefly conferred with Ward and then replied:

> I think he's wanting me [and other defense attorney] to take on basically all the trial work. I think he wants to be involved, but I don't plan on having him do anything that counsel will be doing. Me or [other defense attorney] will be cross examining, examinations, *voir dire*, etcetera, arguing most objections. I think he does want to be present for bench conferences.

Ward did not say anything.[6] The Commonwealth had no objection to this division of responsibilities.

A dispute on the defense's trial strategy arose between counsel and Ward mid-trial and counsel requested and received an *ex-parte* conference to address this issue. Ward explained that the previous day when discussing trial strategy with counsel, he learned for the first time that counsel had no intention of recalling the Commonwealth witnesses during his case-in-chief. Ward explained he had listened to counsel's reasoning, had thought about it, but he

---

[6] In a hybrid counsel situation, it would be prudent for the trial court to specifically ask whether the defendant wished to respond to what defense counsel had stated and/or whether the defendant agreed with this representation as to how their duties would be divided. However, such proactive behavior on the part of the trial court is not required. Ward had the obligation to speak up if he disagreed with how their duties would be divided.

12

still wanted these witnesses recalled as he wanted to impeach them with contradictions.

Ward explained his belief that one witness's testimony was an "absolute case of perjury" with "numerous misstatements that can easily be, with records that already exist, proven false." Ward maintained that as to these witnesses, "to not degrade that testimony further I feel leaves a false impression on the strength of those witnesses in the minds of the jury and so I'd ask that they be recalled . . . . [Counsel's] response was 'no,'" because counsel "didn't feel like 'cutting our wrists' by recalling them."

Ward mentioned specifically that he wanted to "show some of the criminal or negligent conduct by some of the officers in this case" and felt that not recalling some of the witnesses on their contradictory statements "leaves me in a very bad position as a defendant." Ward stated, "I know that I have no legal capability to make [counsel] do as I've requested." He explained that if he had known counsel was not going to recall these witnesses, he would have insisted on a more thorough cross-examination.

Counsel responded that "he wants to recall some of the witnesses like [Palmer], [Christos], [Fiely], [Bohley] potentially," explained counsel thought the cross-examinations against them had gone well, and feared recalling them "to establish very minor tweaks" and opening them up to cross-examination by the Commonwealth would "result in completely obliterating the work we have done thus far," opining that it would be negligent to recall those witnesses, and doing so would "fail tremendously."

13

The trial court repeatedly urged Ward and counsel to try to resolve their dispute and come to an agreement. When no progress was made, the trial court suggested that perhaps Ward could personally recall the witnesses.

Counsel responded, "I would be totally fine with it if he would take it over and he would recall his witnesses if he wants, to ask them questions. But the pretrial ruling is that those particular witnesses that he wouldn't be allowed to examine."

The trial court confirmed that the pretrial ruling was going to stand. Ward did not express any dispute with this ruling or the process by which it had been made.

Counsel then explained "So it's put back on me, like, I'd essentially be asking the questions that he asks, and then it just turns me into his puppet as opposed to counsel. I'd no longer have any autonomy."

The trial court responded, "There are limits as you know of things that an attorney is required to do," urged Ward and counsel to reach an agreement, stating "I am certainly not going to give a directive that you [counsel] have to do that" and if there was an impasse on the issue, it was preserved for appeal.

The witnesses that Ward asked to recall were not recalled by counsel or by Ward.[7]

---

[7] It is unclear whether these witnesses had been finally dismissed or were subject to recall, and whether it was feasible to recall them without delaying the trial. In the absence of any discussion of this issue, we do not consider these potential complications further.

Ward argues that because the trial court did not require counsel to recall and examine the Commonwealth's witnesses that Ward was deprived of his Sixth Amendment right to self-representation, thus denying him the right to a defense of his own choosing. He argued this constituted a structural error which does not require that he demonstrates harm to require reversal.

Hybrid representation strikes a balance between the right to self-representation and the right to counsel.

> Kentucky courts view hybrid counsel as self-representation, in part. That is, the defendant makes a limited waiver of counsel whereby he acts as co-counsel with a licensed attorney. The defendant specifies the extent of legal services he desires, but undertakes the remaining portion of his defense pro se.

*Allen v. Commonwealth*, 410 S.W.3d 125, 138-39 (Ky. 2013) (citation footnotes and quotation marks omitted).

All defendants have certain constitutional rights which must be honored, "no matter how unwise[.]" *Ortega v. O'Leary,* 843 F.2d 258, 261 (7th Cir. 1988). "[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas." *Faretta v. California*, 422 U.S. 806, 820 (1975). In such a situation, counsel is generally empowered to "sail the trial ship." *Hall v. Commonwealth*, 557 S.W.2d 420, 423 (Ky. 1977). That is, defense counsel is generally empowered to make all final decisions that are not constitutionally reserved to the defendant. That does not mean that a defendant does not contribute to this decision-making process but does not

"make the final call" for most strategic decisions. This is permissible because "the accused has acquiesced in such representation." *Faretta*, 422 U.S. at 821.

When a defendant asserts the right to hybrid counsel, the defendant "dictat[es] the extent of counsel's involvement[,]" with the trial court only permitted to "structure the role and scope of hybrid counsel[.]" *Major v. Commonwealth*, 275 S.W.3d 706, 722 (Ky. 2009). Splitting the role of counsel in such a situation can result in "countless variations on how the duties of the defense will be divided between a defendant and his hybrid counsel." *Nunn v. Commonwealth*, 461 S.W.3d 741, 750 (Ky. 2015). Accordingly, reviewing courts "also give correspondingly wide, but not unlimited, latitude to the trial judges to manage those countless variations in their effort to accommodate a defendant's desire for hybrid counsel." *Id.*

In a hybrid counsel situation, the defendant has acquiesced in part to representation by defense counsel. How, then, are common disagreements between defense counsel and a defendant (which do not involve constitutional rights which are always reserved for the defendant's decision) to be resolved, such as what questions should be asked of witnesses and what trial strategy should be pursued? Despite disagreements about such matters, "lawyers are charged with protecting their client's interests." *Zapata v. Commonwealth*, 676 S.W.3d 390, 401 (Ky. 2020).

Ward inadequately alleges he did not understand he was being deprived of the option to examine certain witnesses during the brief hearing on this matter and would have objected if he had known. However, any error in this

16

regard was harmless because the trial court's decision on this matter was reasonable under the circumstances. *See Partin v. Commonwealth,* 168 S.W.3d 23, 27-29 (Ky. 2005) (explaining that a defendant acting as co-counsel does not have a constitutional right to personally cross-examine victims and intimidate witnesses any more than a self-represented defendant would) *superseded on other grounds by statutory amendment as noted in Stansbury v. Commonwealth,* 454 S.W.3d 293, 299 n.1 (Ky. 2015); *Allen,* 410 S.W.3d at 134 (explaining that trial courts may appropriately place certain restrictions on a defendant's right to self-representation, including requiring defense counsel to cross-examine victim-witnesses instead of the defendant).

We review whether Ward's right to hybrid representation was violated when the trial court allowed counsel to overrule Ward's strategic decision to require counsel to recall Commonwealth witnesses during his case-in-chief so that counsel could further impeach them. Prior to this time, counsel was conducting the trial and Ward was largely acting as co-counsel in name only. This was in accordance with the division of representation established pretrial.

Each witness Ward wanted to call had already been vigorously cross-examined by counsel during the Commonwealth's case-in-chief. For those witnesses whom he wanted to recall but could not personally question, it is well established that the appropriate solution would have been for Ward to prepare questions for counsel to use to question such witnesses on his behalf. *See Partin,* 168 S.W.3d at 28-29.

17

The right to hybrid counsel does not give a defendant more rights than defendants who chose to have counsel represent them or to engage in self-representation; it instead combines these rights. If any error occurred, it was harmless.

## B. Were the Objections to the Firearm Toolmark Examiner's Expert's Testimony Adequately Preserved through the Motion *in Limine*, and if so, should this Testimony have been Excluded or Limited?—Partially Preserved

In a five-page motion *in limine*, the defense sought to prohibit the Commonwealth from:

> [E]liciting any testimony—direct or indirect—using terms such as "match," stating an opinion to a degree of statistical or scientific certainty, or phrasing an opinion "to the exclusion of all other firearms." More specifically, the Defense objects to any testimony concluding that the shell casings and other ballistic evidence were fired from the same firearm.

In support of that restriction, the defense discussed *Garrett* and argued that its decision as to the appropriateness of admitting such evidence was limited because it relied on *United States v. Otero*, 849 F.Supp.2d 425 (D.N.J. 2012), *aff'd* 557 Fed. Appx. 146 (3rd Cir. 2014), and neither case considered the *PCAST Report* (which was released after *Otero* and the trial court decision in *Garrett*). The defense argued a more in-depth *Daubert* analysis in other jurisdictions had revealed that the methods used in firearm toolmark analysis "largely fails the fourth prong of *Daubert*" as the standard put out by the Association of Firearm and Toolmark Examiners (AFTE) in its *AFTE Theory of*

*Identification*[8] is entirely subjective, justifying limiting the degree of certainty that Owens could express.

The Commonwealth conceded to certain limitations as being appropriate but cited to *Garrett*, an unpublished opinion, and its own list extra-jurisdictional cases as to why it should still be acceptable for Owens to conclude that all of the shell casings came from the same firearm.

During the hearing regarding the defense's motion *in limine*, given the Commonwealth's concessions, the only issue under consideration was whether it would be proper for Owens to opine, consistent with her written report, that the nine shell casings collected from the murder scene and the two shell casings collected from the farm were fired from the same firearm. The trial court specifically inquired as to whether the defense was requesting a *Daubert* hearing. The defense replied "no" and then proceeded to criticize the foundational validity of the science of firearm toolmark analysis.

The defense acknowledged that the markings on the shell casings were objective evidence, but explained it was concerned with how such objective data was being subjectively interpreted. Specifically, the defense noted that unlike fingerprints in which a certain number of corresponding "pits" were required to determine a match, there was no such controlling criteria for matching shell casings, and the *PCAST Report* had criticized that the supposed

---

[8] *AFTE Theory of Identification as it Relates to Toolmarks*, Association of Firearm and Tool Mark Examiners, https://afte.org/about-us/what-is-afte/afte-theory-of-identification (last visited Mar. 14, 2024).

19

high match rate in studies was the result of a lack of appropriate "black-box" studies and deeming inconclusive results as not being identification errors.

However, the defense conceded that under existing case law in Kentucky the methodology Owens used to make her firearm toolmark identification of the shell casings could not be attacked as it had previously been ruled to satisfy *Daubert* in *Garrett.* Therefore, the defense explained it was not challenging Owens's method or credentials. Rather, it sought to limit the certainty Owens could express in testifying about her ultimate opinion.

The defense requested that Owens be required to phrase her opinion in more neutral terms and be limited to opining that the shell casings "*were consistent with* having been fired from the same firearm." (Emphasis added). The trial court rejected this proposed limitation as "not much different," but stated the objection was preserved for higher court review.

As previously mentioned, we had the parties specifically brief and argue the sole issue of whether we should reconsider our ruling in *Garrett* regarding whether firearm toolmark examiners could testify to their conclusions that ballistic samples came from the same firearm. Ward's counsel in supplemental briefing and oral argument presented two alternative requests: to exclude such evidence entirely or to limit expert identification testimony to "*cannot be excluded as* having been fired from the same firearm." (Emphasis added).

### 1. Admissibility of Expert Testimony on Firearm Toolmark Identification in Kentucky

Expert opinion regarding firearm toolmark identification has long been admitted in Kentucky. *See Morris v. Commonwealth*, 306 Ky. 349, 208 S.W.2d 58, 60 (1948).

In *Garrett*, the defendant asked for a *Daubert* hearing, arguing firearm toolmark identification did not meet the criteria set forth in KRE 702 for admissibility because it was no longer considered reliable pursuant to a 2009 report produced by the National Research Council entitled *Strengthening Forensic Science in the United States: A Path Forward* (*NRC Report*).[9] *Garrett*, 534 S.W.3d at 221-22. After a *Daubert* hearing, the trial court upheld the reliability of such expert testimony, allowing the firearm toolmark examiner to testify that the fired bullets matched a particular firearm.

Our Court affirmed, relying on *Otero*. While our Court acknowledged that there was a subjective component to the analysis, it concluded a firearm toolmark examiner could properly opine the bullets "were fired from the same firearm" because this opinion was not couched in "'absolute certainty' so as to require exclusion." *Garrett*, 534 S.W.3d at 222-23. Our Court held that "[t]he proper avenue for Garrett to address his concerns about the methodology and

---

[9] National Research Council, *Strengthening Forensic Science in the United States: A Path Forward*, The National Academies Press, 150-55 (2009), https://nap. nationalacademies.org/read/12589/chapter/7#150 (section pertaining to firearms toolmark identification).

21

reliability of [the firearm toolmark examiner's] testimony was through cross-examination, as well as through the testimony of his own expert." *Id.* at 223.

## 2. Ward's Specific Challenge

Before trial, the defense sought to limit the scope of Owens's expert testimony through a motion *in limine* and specifically denied that it was requesting a *Daubert* hearing. Ward now seeks to ban expert testimony regarding firearm toolmark analysis as unreliable or limit the definitiveness of such opinion testimony.

Unfortunately for Ward, the defense did not appropriately preserve its current challenge through its motion *in limine*, even though Owens's testimony was anticipated to be powerful, and the shell casings were the only physical evidence which could connect Ward to the murders. Although *Garrett* was potentially controlling as to who bore the burden of establishing whether such evidence could be admitted and what limitations to such testimony were appropriate, the admission of Owens's expert testimony and how she could present her expert opinion could still be challenged by the defense requesting a *Daubert* hearing and providing an expert to support its arguments. Relief was not precluded. Even if such a motion may have been denied consistent with *Garrett* and *Williams*, this would have preserved the record to allow our Court to consider whether such a hearing should have been granted based on the arguments and materials submitted to the trial court for consideration.

Given the substantive although not unchallenged authorities that Ward was able to produce on appeal, including recent opinions from our sister courts

retreating from the wholesale admission of such evidence, there were certainly ample grounds to challenge whether Owens's expert opinion should be limited or qualified in some manner. While *Garrett* provides a basis for concluding that firearm toolmark examiners' expert testimony is generally admissible, it does not justify failing to hold a *Daubert* hearing as to the appropriate limitations to such testimony because the definitiveness of such identification is unsettled. Although we understand that challenging what appears to be controlling law is a difficult road to follow, forgoing a request for a *Daubert* hearing was a fatal decision which precludes relief on appeal. *See Tharp v. Commonwealth*, 40 S.W.3d 356, 368 (Ky. 2000).

While we acknowledge that Ward's argument about limitations to be placed on Owens's expert opinion testimony were nominally preserved based upon the defense motion *in limine,* such limitations could not appropriately be explored without the accompanying request for a *Daubert* hearing to create a record supporting why such limitations were appropriate. Additionally, the limited relief the defense requested—that Owens's testimony be modified to state that both sets of shell casings "were consistent with having been fired from the same firearm"—was abandoned on appeal in favor of the different and more expansive limitation of "cannot be excluded as having been fired from the same firearm." We agree with the trial court that the original requested limitation would not have much impact and, therefore, any error in failing to grant this modification is harmless. We cannot provide Ward with specific relief

that was not pursued and preserved below and must affirm the admission of such evidence.

**C. Did Detective Hull Offer Improper Opinion Testimony when he Interpreted Security Videos; Alternatively, should these Videos have been Excluded as Irrelevant? — Partially Preserved**

Detective Hull provided a timeline of events based on the evidence he had reviewed which included his narration of timestamped black and white surveillance video recorded by two cameras at a Little Caesar's store. The jury saw individual videos from each camera and then a spliced video.

The Little Caesar's videos captured a view of what Detective Hull opined were two different vehicles driving on the street that provided the only vehicular entrance into the apartment complex where Kramer and Aiden lived. The recording from the front camera offered a somewhat better view. The back camera captured a much smaller glimpse of a vehicle which was reflected from the front of the apartment building doors in just a small corner of the video recording. There appeared to be no illumination beyond the store lights and, so, it was mostly the vehicles' lights that were captured, along with vague shapes of the automobiles.

Without objection, the videos were introduced into evidence and Detective Hull narrated his impressions. He stated that a vehicle appeared to enter the apartment complex at 10:13 p.m., a second vehicle arrived at the complex at 10:46 p.m. (which he opined was Kramer's vehicle based on when her phone connecting to her apartment Wi-Fi router at 10:51 p.m.), and then the first vehicle reappeared at 11:31 p.m., pulling into a parking spot and being

left running for about a minute. Detective Hull noted when the vehicle's lights went off, opined it was running based on a reflection of exhaust, noted that its lights came back on at 11:33 p.m. and then the vehicle backed out and left.

The Commonwealth Attorney asked Detective Hull: "So what do you think we've just witnessed here, based on your investigation and viewing of this?" Ward objected on the basis that Detective Hull was speculating as all that could be seen were vehicles driving by and headlights, and that it was for the jury to decide what this meant, not Detective Hall who was "not qualified to do that." The Commonwealth Attorney countered that it was appropriate for Detective Hull to provide his theory of the case. Ward countered that he believed that was appropriate for closing argument and not an appropriate question.

The trial court overruled the objection, stating that it was appropriate for the detective to provide his conclusions based on his observations and, to the extent this was weak evidence, that could be uncovered by cross-examination.

Detective Hull responded he believed the video provided the timeframe of what occurred between the time Kramer's vehicle arrived and when the other vehicle left, when "[Kramer] and Aiden were executed," explaining that there was no outgoing activity on Kramer's phone after her phone connected to the Wi-Fi.

Detective Hull next testified that, although he could not make out a license plate or who the operator was of the vehicle he suspected was driven by the murderer, he took steps to determine what vehicle it may have been. He

explained, based on pictures of Ward's vehicle and stills of the suspicious vehicle taken from the surveillance videos, he believed both vehicles had similar features and could not exclude Ward's vehicle from being the same vehicle as in the video. Exhibits were admitted comparing the vehicles.[10] Detective Hull noted that when asked to identify vehicles he looks at distinct features such as headlights, taillights, bumpers, any damage and whatever else stood out.

The defense objected, stating that Detective Hull had not been identified or noticed as an expert, explaining counsel believed that he was getting into expert testimony about his ability to determine if Ward's vehicle matched the vehicle in question, which was a matter for the jury to determine. The trial court ruled that Detective Hull would be allowed to answer what he found significant in comparing the images without being proffered as an expert, but limited his further testimony, explaining "I'm not going to allow him to express an opinion as to whose car this was." Detective Hull then testified as to the similarities he perceived regarding the back bumper, how the brake lights reflected on a dead and curved area, the basic geometry of the front hood, front quarter panel and headlights.

During cross-examination, the defense refreshed Detective Hull's recollection and got him to acknowledge he had asked Christos in her interview

---

[10] The photographs of Ward's vehicle were colored photographs taken in the daytime with the lights off; the photographs of the second vehicle were black and white, blurry, with the lights on and not taken at the same angle.

if Ward could have borrowed her daughter's boyfriend's vehicle and he stated to her that he did not think the vehicle he saw in the video was Ward's vehicle. Other witnesses testified that they were asked by police if Ward had ever borrowed their vehicles and they all answered "no."

During the Commonwealth's closing argument, it argued that the video showed Ward's vehicle rather than Sullivan's, and the "quick in and out" of the vehicle showed what a cold and calculated murderer Ward was.

Ward argues that pursuant to Kentucky Rules of Evidence (KRE) 602, it was improper for Detective Hull to interpret what was on the video because he did not personally witness the recorded events and was a lay witness whose testimony was limited per KRE 701, and that in doing so he impermissibly invaded the province of the jury. He argues that Detective Hull's testimony was prejudicial where he indicated he could see Kramer's vehicle, Ward's vehicle,[11] and determine the timing of the murders, noting that a jury would be likely to think a police officer's testimony on such a matter was reliable. Ward argues that the timing the detective assigned to the murders and the identification of the suspicious vehicle as being his harmed him as it placed him at a murder

---

[11] We note Ward overstates Detective Hull's testimony, repeatedly indicating that Detective Hull identified the suspicious vehicle as being Ward's. In fact, Detective Hull never identified Ward's vehicle as matching the vehicle he attributed to the murderer. Earlier, and without objection, Detective Hull stated that he could not exclude Ward's vehicle. Detective Hull's subsequent testimony was only that he thought certain features were similar between the two vehicles.

27

scene where there was virtually no evidence linking him to the murders and eliminated Sullivan and various others as alternative perpetrators.

Alternatively, Ward argues that the videos should have been excluded as irrelevant, because the poor quality of the videos was of limited probative value and was substantially outweighed by the danger of undue prejudice pursuant to KRE 403.

Ward concedes that these issues are only partially preserved through his prior objections and requests palpable error review to the extent the issues he raises on appeal are unpreserved.

Ward's argument that all of Detective Hull's interpretations of the videos were improper is subject to palpable error review. Pursuant to Kentucky Rules of Criminal Procedure (RCr) 10.26:

> A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

In discussing the relevant rules about lay witnesses testifying about videos, our Court in *Morgan v. Commonwealth*, 421 S.W.3d 388, 392 (Ky. 2014), explained as follows:

> KRE 701 limits opinion testimony by a lay witness to that which is "[r]ationally based on the perception of the witness; [and] . . . [h]elpful to a clear understanding of the witness' testimony or the determination of a fact in issue." KRE 701(a)-(b). In addition, KRE 602 requires a witness to have personal knowledge before being allowed to testify about a subject.

We further clarified in *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014), that "narration of a video may be proper but only if it is comprised of

28

opinions and inferences that are rationally based on the witnesses' own perceptions *of which he had personal knowledge* and that are helpful to the jury." (Emphasis added). In contrast, it is improper for witnesses to narrate a video of "events that they did not perceive in real time." *Boyd v. Commonwealth*, 439 S.W.3d 126, 131-32 (Ky. 2014). If a video is unclear and there is uncertainty as to which of the actions the person narrating the video had personal knowledge, such narration should not be permitted. *Kimmel v. Commonwealth*, 671 S.W.3d 230, 245 (Ky. 2023). Even when witnesses have personal knowledge of the recorded events, narration is "improper when the witnesses interpret the footage or offer an opinion." *Boyd v. Commonwealth*, 439 S.W.3d 126, 131 (Ky. 2014). *Compare with Cuzick v. Commonwealth*, 276 S.W.3d 260, 266 (Ky. 2009) (appropriate to allow officers who participated in a police chase to answer questions relating to videos captured by in car cameras as this was "proper lay opinion testimony which was beneficial to the jury"); *Prescott v. Commonwealth*, 572 S.W.3d 913, 928 (Ky. App. 2019) (confirming that it was appropriate for a witness to narrate videos of "relatively poor quality" where that witness "had firsthand knowledge of everything the videos portrayed" as it "certainly helped clarify what the video portrayed in a manner helpful to the jury").

We do not perceive any error in Detective Hull explaining where the video was obtained, the locations shown in the videos, and the timing of the videos in relationship to when security footage recorded Kramer at the McDonald's and when her Wi-Fi connected in her apartment complex. This was helpful for the

jury to understand what it might be viewing in the overall timing of other events.

However, it was improper for Detective Hull to narrate the events depicted in the videos, as he did not personally observe these events as they occurred, and it was improper for him to interpret for the jury what he saw in the videos since interpreting the videos should have been left to the jury. The jury should have been allowed to interpret for itself whether the vehicle first seen at 10:13 p.m. was the same vehicle seen at 11:31 p.m., what the vehicle was doing between 11:31 p.m. and 11:33 p.m., and whether it was kept running or not, and whether the vehicle that appeared shortly before Kramer's Wi-Fi connected was Kramer's vehicle. However, we do not believe that Detective Hull's testimony as to these matters constituted palpable error.

Similar errors were not concluded to be palpable in *Kimmel* where the jury viewed the video and could independently interpret it, and the evidence against the defendant was substantial. 671 S.W.3d at 245. Detective Hull's testimony was certainly not definitive on the matter, and we believe it was harmless.

As to the testimony regarding comparing Ward's vehicle to the vehicle Detective Hull speculated was used by the murderer, Ward permitted without objection for Detective Hull to testify that he could not exclude Ward's vehicle, and to explain the commonalities he would look for in comparing vehicles, only objecting when Ward believed Detective Hull was about to give an opinion that Ward's vehicle was a match. However, that objection successfully prevented

Detective Hull from being able to state such an option, and he only proceeded to testify as to similarities. As the jury had the stills from the video and photographs of Ward's car before it during deliberation and could ask to view the videos again (and did as to one video), jurors could judge for themselves whether they thought these vehicles were similar or a match. So, while it was error to permit such testimony, we believe this testimony was harmless, especially in light of the effective cross-examination. We also believe it is within the jury's common knowledge that many vehicles may appear similar as vehicle manufacturers make many identical vehicles and the stills did not reveal the color of the vehicle or any striking identifying characteristics.

We disagree with Ward that the Commonwealth did not satisfy the low bar for relevance. While the video recordings were of rather poor quality and were certainly not definitive regarding what took place inside Kramer's apartment, they are sufficient to meet this standard as these videos could depict the movement of vehicles which was relevant to the timeline of when Kramer arrived home and when a vehicle possibly connected to the murders left.

**D. Was Ward Denied his Right to Silence when Questions were Asked about his Phone Encryption and Preventing Police from Accessing Information on his Phone? – Partially Preserved**

After Ward was arrested, a search warrant was issued which included seizure of his phones. Once his current phone was in police custody, the police were unable to access its contents.

During the Commonwealth's case-in-chief, various witnesses provided testimony that Ward touted the Wickr app as providing phone privacy and either asked them to install that app or assisted them with installing it on their phones.

During Detective VonDerHaar's testimony, Ward objected preemptively to anticipated testimony from him indicating that Ward would not give the police the password to unlock his cell phone, arguing this was akin to commenting on his right to remain silent. The Commonwealth agreed not to specifically ask if Ward refused to give the police his passwords and the trial court determined that the detective could appropriately testify that he could not access the contents of Ward's phone because it was encrypted. Detective VonDerHaar testified in accordance with this restriction.

When Ward took the stand, he testified he had installed the Wickr app on his phone to conceal messages as he believed it would be helpful for being a hypnotist, explaining it would allow him to maintain privacy which was important in such a profession. During cross-examination, the following exchange took place:

> CW: You made it impossible for anyone to look into your phone?
>
> Ward: Nuh, if you wish to consider the inherent encryption on the phone, but as was testified to, Aiden also had the same phone. That's just part of that phone's operation [sic] system.
>
> CW: But Aiden didn't have Wickr, you did.
>
> Ward: I did.

32

CW:         And you installed it on [Fiely's] phone?

Ward:       I did not install it. She installed it herself.

CW:         Okay, I'm sorry. You installed it on [Palmer's] phone?

Ward:       I did. At their request.

CW:         So, your testimony—

Ward:       Asked if willing to do it, would, asked me to install it.

Ward argues on appeal that this questioning and the subsequent answers to it violated his right to silence. Ward argues: "The Commonwealth clearly invited the jury to infer guilt from [Ward's] refusal to turn over his password."

Relevance is the fundamental bedrock on which all evidence initially becomes admissible at trial. Ward's argument and the Commonwealth's response thereto, assume that the police's inability to access the contents of Ward's cell phone is relevant to establishing whether Ward murdered Kramer and Aiden. However, there is no logical reason why this is so.

While the police secured a warrant to seize the phone and access its contents, this is no more than an acknowledgment of the fact that information relevant a crime potentially could be found within it and not any kind of proof that such kind of information did exist. A cell phone which is seized but whose contents cannot be accessed is a complete unknown. A locked cell phone either has incriminating content in the data contained therein or it does not. But if the cell phone data is never accessed, it cannot be determined if its contents are incriminating and therefore relevant.

33

Similarly, the fact that a cell phone is password protected has no relevance. Password protection on cell phones was and continues to be ubiquitous, and other newer protections such as biometric access are similarly gaining widespread use. Encryption can be built into a cell phone's operating system, with some companies specifically designing cell phones to protect privacy through heightened security measures.[12] It is also not unusual for people to protect their privacy by using specific apps. Ward using the Wickr app, suggesting its use to other people, and recommending or assisting in its installation is totally irrelevant to the decision of whether he is a murderer.[13] Having a password and/or encryption protection on a cell phone is neither evidence of guilt nor provides for an inference that any evidence of guilt may be found therein. It is equivalent to a person locking their vehicle or house door.

The right to privacy in one's effects/possessions is enshrined in the Fourth Amendment and in Section 10 of the Kentucky Constitution. The contents of a cell phone are entitled to such protection. *Riley v. California*, 573 U.S. 373, 401 (2014). *See also Carpenter v. United States*, 585 U.S. 296, 309-11 (2018) (determining a warrant is required to access data to map a person's

---

[12] Apple products such as the iPhone have hardware security, system security, encryption and data protection, app security, and services security as part of Apple's basic platform. *Apple Platform Security*, Apple, https://support.apple.com/guide /security/welcome/web (last visited Mar. 14, 2024).

[13] We are uncertain why the Commonwealth "made a mountain out of this molehill" by repeatedly asking witnesses about Ward's conduct relating to this app.

movement based on cell phone records); *Commonwealth v. Reed*, 647 S.W.3d 237 (Ky. 2022).

When a search warrant is granted for a cell phone, whether the police in fact gain access to its data is up to them. There is no duty for citizens to assist police in criminal investigations. This is not altered by a warrant being served.[14]

Requiring such a duty to assist the police in accessing the contents of one's phone or apps would turn the right to privacy found in the Fourth Amendment/Ky Const § 10 on its head and run afoul of the right not to incriminate oneself found in the Fifth Amendment/Ky. Const. § 11. It is well established that a defendant's choice to remain silent during a custodial interrogation cannot be used against a defendant by the Commonwealth to establish guilt. *Miranda v. Arizona*, 384 U.S. 436 (1966). Exercising one's constitutional rights cannot be offered as evidence of guilt. *Commonwealth v. McCarthy*, 628 S.W.3d 18, 36 (Ky. 2021). Thus, Ward had no duty to assist the police in gaining access to the contents of his cell phone and his exercise of his constitutional rights cannot be used against him as evidence of his guilt.

---

[14] In recognition that citizens often will not assist police in gaining entry to their homes in the execution of a warrant, various jurisdictions have statutory warrant requirements which allow police to break into buildings to execute a warrant if they knock and are refused entry. The Fourth Amendment is not violated where exigent circumstances require breaking in to execute a warrant without knocking and allowing occupants to voluntarily grant entry. *United States v. Ramirez*, 523 U.S. 65 (1998). *See Adcock v. Commonwealth*, 967 S.W.2d 6, 11 (Ky. 1998) (holding ruse entry is permissible under the Fourth Amendment to execute a warrant).

We recognize there are many reasons why someone who has not committed a crime would refuse to assist the police in its investigation in rifling through that person's personal effects. Ward's lifestyle choices and profession would certainly provide him with ample reasons to continue to safeguard his privacy to the extent possible. No inference of guilt can thereby be made from Ward's failure to voluntarily assist the police in such endeavor. "In most circumstances silence is so ambiguous that it is of little probative force" and "also has a significant potential for prejudice." *United States v. Hale*, 422 U.S. 171, 176, 180 (1975). This makes Ward's failure to help investigators irrelevant.

As the unknown contents of Ward's cell phone are irrelevant, his use of a password and encryption on his phone (as well as his use of the Wickr app) is irrelevant, and his failure to help the police access the contents of his phone is irrelevant, no testimony regarding any of these issues should have been allowed, yet a substantial amount of testimony about this subject was elicited. This trial demonstrates why these issues should have never been delved into in the first place.

However, whether we consider the issue of the admission of this testimony under relevance or as under Ward's preferred argument that it violated his right to silence, ultimately such testimony was harmless or not palpable error.

We are satisfied that as to Detective VonDerHaar's testimony during the Commonwealth's case-in-chief, though irrelevant, was not a direct comment on

36

Ward's right to silence. Detective VonDerHaar's comment—that he could not access the contents of Ward's cell phone due to encryption—may have left the jury wondering why he could not access Ward's cell phone but this was not directly connected to what Ward did or did not say or do. There was no intimation in the questions posed to the detective or in his answers that Ward was asked for his password and refused to provide it.

While the question posed to Ward appears to have been inviting the jury to find guilt based on his failure to voluntarily cooperate with police and grant access to the contents of his cell phone, and we believe this to be improper because it was unknown whether there was anything incriminating to be accessed had his cell phone been unlocked, we do not believe this testimony realistically had any impact on the jury's verdict. The error in permitting such testimony was harmless as to Detective VonDerHaars's testimony and not palpable as to Ward's testimony. Simply put, this was a minor error on a topic of limited significance. Therefore, there is no basis for reversal on this ground.

### E. Did Prosecutorial Misconduct Deprive Ward of a Fair Trial—Unpreserved

Ward argues that prosecutorial misconduct occurred during the Commonwealth's closing argument which deliberately misstated various facts in evidence: (1) Palmer's testimony about discussing silencers with Ward; (2) Weitz's testimony about why DNA might not be on shell casings; (3) grossly overstating the certainty of Owens's identification; and (4) stating a blood stain on the wall was Aiden's fingerprint. Ward did not make any objection and requests palpable error review.

37

We recognize that it can be problematic to object during opening statements and closing arguments. Such objections can be a tactical way to interrupt the speaker's concentration, and in recognition of that danger some trial courts prohibit objections during closing arguments. Our precedent requires that if a trial court permits objections during argument, prompt objections must be made. *Wallace v. Commonwealth*, 478 S.W.3d 291, 297 (Ky. 2015).

If a trial court does not allow objections during opening statements or closing arguments, any objections which are made immediately after a party's opening statement (before any testimony) or closing argument (before the jury is excused) should be considered timely and preserved, as the error is properly brought thereby to the attention of the trial court as soon as may be permitted. Under these circumstances, such objections are sufficiently contemporaneous to fulfill the purposes of Kentucky Rules of Criminal Procedure (RCr) 9.22 and preserve such objections for review because at such a time curative instructions can be rendered to the jury if needed. *See Polk v. Greer*, 222 S.W.3d 263, 265 (Ky. App. 2007) (determining that an objection made to an opening statement after its conclusion and less than a minute after the claimed error occurred satisfied the "contemporaneous objection" requirement of Kentucky Rules of Civil Procedure (CR) 46, which is analogous to RCr 9.22, because it afforded the trial court an opportunity to cure the error in a timely fashion before the trial moved on from this phase); *Weaver v. Commonwealth*, 955 S.W.2d 722, 728 (Ky. 1997) (explaining that the reasoning behind the

38

contemporaneous objection requirement was to allow the trial court to have "the opportunity to consider whether an admonition would cure the error"). However, the defense did not make an objection during the Commonwealth's closing argument, or immediately thereafter its conclusion and, thus, we must conduct palpable error review.

Prosecutorial misconduct is "a prosecutor's improper or illegal act involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011) (quoting *Black's Law Dictionary* (9th ed. 2009)) (brackets and ellipses omitted). While prosecutorial misconduct can occur through an improper closing argument, we must keep in mind that prosecutors have wide latitude in giving closing arguments and are free to draw any and all reasonable inferences from the evidence. *Hall v. Commonwealth*, 645 S.W.3d 383, 398 (Ky. 2022).

"Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair." *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001) (internal citation omitted). "For unpreserved prosecutorial misconduct to be reversible, it must have been flagrant." *St. Clair v. Commonwealth*, 451 S.W.3d 597, 640 (Ky. 2014)

> To determine whether improper conduct is flagrant and requires reversal, this Court weighs four factors: (1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether

39

they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused.

*Barrett v. Commonwealth*, 677 S.W.3d 326, 334 (Ky. 2023).

To properly evaluate Ward's allegations of prosecutorial misconduct, we must put these four comments in the context of both closing arguments. It is important to note that these were lengthy and far-ranging closing arguments. The defense closing argument was fifty-four minutes long and the Commonwealth's closing argument was forty minutes long. These closing arguments covered many more topics than recited here and the complained of errors were a small percentage of the total arguments.

### 1. Silencer

Ward argues that the Commonwealth changed Palmer's testimony that she had talked about silencers with Ward and he stated, "they can easily be made from home" to "I know how to make a homemade silencer."

In the defense closing argument, the defense specifically argued that there was no evidence that a silencer was made and instead neighbors perhaps simply did not want to come forward and get involved. The defense also argued that Palmer made up a lot of things.

The Commonwealth countered this evidence by referring to what Ward supposedly told Palmer twice, once in conjunction with why no one heard the gunshots and once in conjunction with why Palmer had reason to fear Ward:

> Nine shots total. Nobody in that apartment complex heard one shot. You know why? Defense, defendant told you, just like he told [Palmer]. "I know how to make a homemade silencer."
> . . .

He told [Palmer], "I know how to make a homemade silencer."

## 2. Gloves

Ward argues that the Commonwealth misrepresented Weitz's testimony that DNA might not be on the shell casings for a variety of reasons including that the individual wore gloves by stating "Weitz . . . explained to you, it's very simple why the defendant's DNA would not be there. He wore gloves."

During the defense closing argument, the defense argued that the murderer had left fingerprints on the glass door, and a bloody fingerprint on the wall after touching Aiden. The defense relied on this to establish that the killer did not wear gloves because the fingerprint did not belong to Ward, Sullivan or the police.

The Commonwealth thus needed to emphasize the possibility that the killer wore gloves and deemphasize the absence of such DNA evidence with the importance of the firearm toolmark identification evidence. The Commonwealth argued that the lack of DNA on the shell casings was easily explainable, first arguing you are "certainly not going to have DNA on the casings when you're wearing gloves." Then later, the Commonwealth connected this explanation to its expert: "Steven Weitz, the ATF lab, explained to you, it's very simple why the defendant's DNA would not be there, he wore gloves. One can conceal their DNA. You know what they can't conceal? The distinctive markings of their murder weapon." Finally, the Commonwealth stated that Aiden's DNA being on the shell casings made sense as DNA transfer occurred from the carpet where

the shell casings fell but emphasized again "His [the murderer's] DNA's not there because he wore gloves."

### 3. Firearms Toolmark Identification

Ward argues that the Commonwealth Attorney committed misconduct as, despite accepting the limitation that Owens could not state her opinion to a degree of statistical or scientific certainty or phrase her opinion "to the exclusion of other firearms," argued about the firearm toolmark identification of the shell casings "it's credible, it's irrefutable evidence. It is beyond a reasonable doubt evidence." Ward argues that the prosecutor's arguments about the strength of such evidence constituted a gross overstatement.

The defense vigorously argued in its closing argument its theory that confirmation bias prevented the police from investigating other possible theories of how the murders may have occurred, including that Novak may have been the murderer as spurned on by jealousy that Sullivan was now involved with Kramer or that the murders could have been the result of a drug deal gone bad. The defense explained that the original investigation into Ward started with Kramer's text about Ward being at the Starbucks where she worked, and the police identifying the wrong person on the Starbucks video as being Ward, and once the police identified Ward as a stalker, they saw everything else through that lens and were eager to confirm this supposition with each piece of evidence, including Owens's firearm toolmark identification to support this specious theory.

Specifically, as to the firearm toolmark identification evidence regarding the shell casings, the defense argued this evidence was not credible, not competent, was not a science, was a subjective opinion with a high degree of error and was nothing like DNA testing which was the gold standard and definitive in identifying and excluding people. The defense explained that without a murder weapon, there was no firearm to test as a control and that Owens had not tested the available .22 firearms used at the farm to see if they produced matching shell casings. The defense showed pictures of the shell casings Owens compared and expressed an opinion that the jury could see that the shape of the fire rim marks was different and the ejector marks were different between these samples, which either meant that different firearms were used or that the same firearm rendered different results, either of which was problematic for identification. The defense reminded the jury that the shell casings located at the farm had been exposed to the elements and a lawnmower over the nine months they remained there. The defense emphasized that Owens did not even know what type of firearm was used to produce the shell casings, having testified that it could have been either a .22 pistol or a .22 rifle, and that she could not identify what brand of firearm was used.

To counter such argument, the Commonwealth displayed photos of four shell casings on a screen during its closing argument for approximately seventeen minutes while repeatedly returning to the importance of this evidence. The Commonwealth argued there could be no confirmation bias because inanimate objects could not be biased. The Commonwealth stated that

43

firearm toolmark evidence was sound physical evidence that had been accepted for one hundred years and confirmed that Ward killed Kramer and Aiden. The Commonwealth argued that the shell casings and the markings on them spoke for Kramer and identified the murderer as Ward. Later, the Commonwealth returned to the importance of this evidence and stated: "100 years this has been around for forensic examinations. It's credible, it's irrefutable evidence. It is beyond a reasonable doubt evidence." The Commonwealth followed up by explaining again that after a microscopic examination Owens had identified both sets of shell casings as being fired from the same firearm. Finally, as to Aiden's murder, the Commonwealth explained that the toolmarks on the shell casings told Aiden's story, how he died and told the jury that Ward was his killer.

**4. Bloody Fingerprint**

Ward argued that despite the crime scene photos showing that Aiden had no blood on his hands and testimony from Detective Cochran that Aiden bled from the position where he was located, the Commonwealth Attorney committed prosecutorial misconduct by arguing in her closing argument that a blood stain on the wall was "Aiden's ridge print. That's him before he is falling to the ground." Ward argues telling the jury Aiden was alive and walking around while suffering the pain of being shot inflamed the jury.

As discussed *infra,* the defense argued that the bloody fingerprint belonged to the real killer who was not wearing gloves. In this context, the Commonwealth was left having to explain that someone else must have made

this fingerprint, since its theory was that Ward had not left any fingerprints because he was wearing gloves (this also tied in with its argument that Ward practiced for the murder by target shooting at the farm while wearing gloves). The defense argument thus spurred the Commonwealth to find someone else who logically could have left the fingerprint.

This is demonstrated by how the Commonwealth addressed this argument:

> The bloodstain on the wall, defense brought that up, you all have the photo of it, it's tiny. You heard from KSP lab it was Aiden's blood. I submit to you, ladies and gentlemen, Aiden wasn't just shot once and died. He was shot three times. That's Aiden's ridge print. That's him before he's falling to the ground.

### 5. Do the Erroneous Assertions as a Whole, Qualify as Flagrant Misconduct which would Require Reversal?

When considered collectively, these remarks had a low potential to mislead the jury and prejudice the accused as they were relatively isolated (both within the Commonwealth's closing argument as a whole and even regarding most of the topics being canvased) and appear to have been a combination of deliberate and accidental remarks. The statements which were couched as witness statements rather than inferences regarding the silencer and the gloves, were mildly misleading, isolated, and likely accidentally placed before the jury with poor wording; overall, they were harmless considering the evidence.

The statement about the strength of the firearm toolmark identification testimony and the statement about Aiden's ridge print were misleading and deliberate. However, given the vigorous and robust closing argument by the

defense, that these statements were made in the context of countering such arguments (thus showing they were not uncontested), and the overall length of the closing arguments which contained ample support for a conviction, they were unlikely to prejudice the defense.

Having considered these factors, overall they weigh against the conduct being flagrant. On balance, we do not believe these prosecutorial errors require reversal as they were not so "egregious as to undermine the essential fairness of Ward's trial." *Barrett*, 677 S.W.3d at 335.

## F. Should Ward's Motion for a Directed Verdict have been Granted?— Preserved

Ward moved for a directed verdict in accordance with CR 50.01 on the basis that there was simply insufficient evidence to convict him.

In considering whether a motion for directed verdict should be granted, "[t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction." *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983).

> If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

"When the denial of a properly preserved directed verdict motion is challenged on appeal, the standard of review is . . . whether, viewing the

46

evidence in the light most favorable to the Commonwealth, any rational juror could have found all the elements of the crime." *Quisenberry v. Commonwealth*, 336 S.W.3d 19, 35 (Ky. 2011).

Given the testimony by witnesses that Ward was angry at Kramer and made threatening statements about what he wanted to do to her, and the rest of the evidence which was properly admitted at trial, the Commonwealth could establish motive, opportunity and connect Ward to the crime. Ward's arguments are in the nature of a closing argument in which he adopts the most favorable interpretation of the evidence, rather than considering the evidence in the light most favorable to the Commonwealth. Accordingly, it is appropriate to affirm the denial of Ward's motions for directed verdict.

### III. CONCLUSION

While harmless errors did occur in Ward's trial, he has failed to establish any reversible errors. Our consideration of the theory, research, and practice behind firearm toolmark analysis has left us with many questions and few answers as to how such evidence should be treated by our trial courts. Certainly, it gives us pause that such experts reach definitive conclusions based on subjective visual inspections, given the limitations of current research to establish the accuracy of such conclusions. However, the defense motion *in limine* was inadequate to preserve this claimed error; preservation required a proper request for a *Daubert* hearing and expert testimony to determine any limitations on the admission of such evidence. Under these circumstances, it is simply not appropriate for us to rule that the Boone Circuit Court abused its

discretion where it appropriately followed our established precedent as to what could be properly admitted in declining to grant the motion *in limine* beyond the Commonwealth's prior concessions. Accordingly, we affirm Ward's convictions and sentence.

All sitting. VanMeter, C.J.; Conley, Lambert, and Thompson, JJ., concur. Bisig, Keller, Nickell, JJ., concur in result only.

COUNSEL FOR APPELLANT:

Shannon Dupree
Kayley V. Barnes
Assistant Public Advocates

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Bryan D. Morrow
Assistant Solicitor General

Todd Ferguson
Assistant Attorney General